# Mattison *v.* The State.

## *Indictment for Murder.*

1. *Relevancy of evidence generally, in cases depending on circumstantial evi-
dence.*—In inquiries of fact dependent for their solution on circumstantial
evidence, no general rule can be laid down, which will define with unerring
accuracy what collateral facts are relevant and admissible in any particular
case; yet, while it is proper to guard strictly against the undue multiplication
of issues, whatever tends to shed light on the main inquiry, and does not with-
draw the minds of the jury from that inquiry, by obtruding on their minds
matters which are foreign, or of questionable pertinency, is, generally, relevant
and competent evidence.

2. *Homicide; evidence of fierceness of defendant's dog, as connected with attend-
ant circumstances.*—On a trial for murder, there being no direct proof of the
circumstances attending the killing, which was committed at night by the de-
fendant, by shooting a person near his house; the defendant's confession having
been given in evidence against him, in the course of which, detailing the cir-
cumstances of the shooting, he said, "that his dog barked, and about the same
time a rock struck his door;" the fierce temper of the dog is not outside of the
main issue, since it might be material to the inquiry, whether the deceased, in
throwing the stone, was attacking the defendant's house, or only defending
himself against the dog.

3. *Proof of fierce character or temper of dog.*—The rule applicable to the proof
of general character, does not extend to proof of the fierce temper or disposi-
tion of a dog; a witness may testify, from his own knowledge and obser-
vation, that a dog is fierce, and inclined to bite, although his fierceness may
not have become notorious, or generally known in the neighborhood.

VOL. LV.

4. *Homicide; charge as to self-defense.*—On a trial under an indictment for murder, a charge which correctly instructs the jury as to the right to kill in self-defense, so far as it concerns the defense of the slayer himself, cannot be held erroneous, because it does not also state the doctrine as applicable to the defense of his wife or child, when the record does not show any evidence presenting that phase of the principle.

FROM the Circuit Court of Randolph.

Tried before the Hon. JOHN HENDERSON.

The prisoner in this case, a freedman, was indicted in the Circuit Court of Cleburn county, for the murder of one Benjamin M. Alsobrooks; removed his trial to Randolph county, where he was tried, convicted of manslaughter in the first degree, and sentenced to imprisonment in the penitentiary for ten years. On his trial, he reserved the following bill of exceptions:

"The defendant pleaded not guilty to the indictment. The State introduced *Frank Price* as a witness, who testified as follows: About 8 o'clock at night, in March, 1874, witness heard two guns in the direction of the defendant's house; and about 7 o'clock the next morning, went over to defendant's house, and saw Benjamin M. Alsobrooks lying on his back, with his hands crossed on his breast, in the cotton patch, about forty yards from the defendant's house; he was dead, and had a hole shot in his head. Witness saw his hat, and some blood, about fifteen steps from defendant's house, and within about five feet of a path leading around the enclosure of the house; saw where it looked as if Alsobrooks had been dragged over the cotton rows, from the hat and blood, to where his body lay; it appeared that he had been scuffling and *scouring* (?) in the ground where he lay all night; he had made a hole in the ground with his head, and had slipped down the hill about two feet. Witness was one mile off when he heard the gun, and heard no other noise in that direction that night. Witness further testified, on cross examination, that when he went to where deceased was lying dead, he saw a single-barreled pistol lying two feet from him; that the pistol was half-cocked, and loaded; that he saw no track about the place; that he went to the place in company with the defendant's wife, Pros. Cunningham, Harry Cunningham, Melissa Cunningham, and several others whose names he could not recollect; that he was at home in his own house when he heard the first gun, and happened immediately to step out, when he heard the other gun.

*M. L. Pinson*, another witness for the State, then testified, that he knew said Alsobrooks in his lifetime, and found him dead, in the spring of 1874, near the defendant's house; that he was lying on his back, and had a hole in his head, and

another wound on his head which looked like a cut made with a rock. It was about 12 o'clock when witness got there, and a great many people were there; and defendant afterwards came up. Defendant's house was about a quarter or half-quarter of a mile from the public road leading from Arbacoochie to Roberts' mill. Alsobrooks was lying in the patch where cotton had been grown, about forty yards from defendant's house, in the edge of the straw near the woods, and about twenty-five or thirty yards from where his hat was lying, and some blood, about five feet from a path leading around the enclosure of defendant's house. The house was enclosed with a new fence, and the path was a near way to Roberts' mill, and passed through a field, and around the enclosure; it was dim, and very rough, and was sometimes travelled by footmen going to said mill. Defendant, in company with Joseph Rusk, Handy Hearn, and others, came up to where the dead body was lying, with a gun on his shoulder. Defendant showed him where he was standing when he shot, and said that the person at whom he shot was in a stooping position at the time, as if he was picking up something. When defendant came up with his gun, he seemed very jovial; and when he showed where the deceased was when he shot him, he was arrested; he seemed jovial, and like a man who had done nothing; said that he shot from the north-west corner of the house. Said witness testified, on cross-examination, that in saying defendant 'looked jovial,' he meant that he looked like he had not killed a man; also, that the ball did not go through Alsobrooks' head, as a rifle-ball would have done at that distance, and, if it was a buck-shot, it was a very large one; that where the body lay, it looked like he had been working his head; also, that Alsobrooks did not live in that neighborhood, but had been taking photographs at Arbacoochie, and had sent off his things; also, that by going around the yard fence, a person would be fifteen steps from defendant's house; and that defendant also said, in the same conversation, they were rocking his house when he shot.

J. S. Camp, another witness for the State, testified, that he saw Alsobrooks about 8 o'clock in the morning after he was killed; that the body was lying about forty yards from the defendant's house, in the edge of the cotton patch, in the broom-sedge; that he was lying on his back, with his hands by his side, and his hat some twenty steps off; saw blood about three feet from the hat, and signs of dragging from where the hat was to the body; the body appeared to have been dragged, the coat being turned back towards the head, the hair turned back on the head, and the back of the head

[Mattison v. The State.]

and the back muddy; saw three apples near him, a little off from a straight line between the body and the hat; also saw signs of struggling where the body lay, the leaves and broom-sedge being torn up as if he had been kicking; there was a bruise on the head, which looked like it might have been made with a rock; the gash on his head was about an inch and a half long; the gun-shot wound was an inch below the bruise, and there appeared to be a gallon or more of blood at the hat. Defendant told witness, on the morning after the homicide, that he and his wife were shelling corn, when his dog barked, and about the same time a rock struck the door; that he got his gun, ran out into the yard, and shot; that his wife handed him ammunition, and he shot a second time; that when he shot the second time, the man in the cotton patch fell; that being out of ammunition, he threw a rock at him, and heard him *holler;* that he then ran back, saw a man near the garden, got some rocks, and run him off; that his gun was an army gun, and was loaded with buck-shot. There was a mill road about three hundred yards from de-fendant's house, and a trail about forty yards from his house, leading to Lamar, Gold Ridge, and other places; and the blood was not five feet from the trail. Witness further tes-tified, on cross-examination, that he saw tracks of persons where the body lay; there were but few of them; the drag-ging was done before the rain, which was not enough to put out the tracks, or wash away the blood; saw no blood between the place where the hat was and where the body was lying; the body looked like he was lying on his back when the kicking was done; the dragging was nearly in a straight line from the hat to the body; the tracks were made by persons with shoes on. Defendant told witness, in the same conversation above mentioned, that a crowd was rock-ing his house when he shot. The path mentioned, leading by defendant's house, was travelled by persons acquainted with the country; it led through the roughest country in that section, and a stranger could hardly get through there at 8 o'clock at night. Witness knew defendant's character for peace in the neighborhood, and it was good.

"*A. W. Shepard* was then introduced as a witness for the State, and testified, that he saw the deceased a few days be-fore he was killed; that deceased was taking photographs at Arbacoochie, where he had been about six months, and was making arrangements to go to Lamar, or some other place; that he was killed on a trail route; that witness, as a physi-cian, examined his wounds; that he was shot in the left tem-ple, and was bruised about two inches behind; that the gun-shot wound produced his death, and he (witness) did not

think there was any external fracture from the bruise. Witness also said, on cross-examination, that he had lived at Arbacoochie a long time, and was well acquainted with all the roads and trails in that country; that the trail leading by defendant's house is a rough route, and goes through the mountains; that he has travelled all over that part of the country, and he would not undertake to travel that trail by night; also, that he was acquainted with defendant's character for peace in that neighborhood, and it was good.  *D. H. Boman* was then examined as a witness for the State, who testified, that in March, 1874, he resided about a mile from the defendant, and that defendant owned a dog.  The prosecuting attorney asked the witness, if he knew the character of said dog for viciousness and biting people; to which the witness replied, that he did not.  The said counsel then asked him, whether the dog had ever attempted to bite him; to which question the defendant objected, on the ground that the character of the dog for biting persons could not be proved in that way.  The court overruled the objection, and allowed the question to be asked; and the witness then said: 'He was a dog of common size, and tolerably fierce: all I know about him is, that he attacked me one night, about two years prior to March, 1874, and I threw a rock at him; I was by myself, and he did not bite me.'  The defendant objected to this testimony, on the ground above stated—that it was incompetent to show the character of the dog for biting— and also as an answer to said question; and duly excepted to the overruling of his objections, and to the admission of the evidence.

"The State here closed, and the defendant then introduced as a witness, *David Cramer* who testified, that he had lived in Arbacoochie twenty-seven years, and knew Alsobrooks, who had been there two or three months taking photographs; that on the 4th March, 1874, he went to defendant's house, about 12 o'clock in the day, and found the dead body of Alsobrooks down below the house, in the edge of the bushes; that he examined the house, and saw eight or nine 'dents' on the house and door, which appeared to have been made with rocks; that he found, on examining them closely, about half of them had sand or grit in them, while the others had none; that he judged the 'dents' not having grit in them were old scars, made with the pole of an axe; that two of the dents with sand in them were on the door, one at the top, and the other lower down; and that the door was on the northeast side of the house.  Witness further testified, that on the day before the homicide, Alsobrooks bought some apples and ginger-brandy from him—bought a quart of the

brandy in the morning, and the apples and a pint of brandy in the evening late; that William Birchfield, Henry Crider, and others were with him during the day, but said Birchfield and Crider were his particular associates during the day, and were with him late in the evening, and they appeared to be a little intoxicated. Witness testified, on cross-examination, that Alsobrooks left Arbacoochie in the morning, with other persons, and they said they were going a-hunting; that he saw him again in the evening, about dusk; that they were all a little intoxicated; that he saw Birchfield, who lived about forty yards from witness, after night going towards Edwardsville, and saw Crider last at the grocery; that he was not certain there was but one impression on the door of the defendant's house—there were two impressions, and both seemed to have been made with one rock; that the house was old, and in a decaying condition; that he supposed some of the scars were old, because he rubbed his finger in them, and did not feel any sand; that some were deeper than the others, and appeared to have been made with the pole of an axe. Being examined in rebuttal, witness said, that Birchfield passed his windows after dark, on the evening of the homicide, going in the direction of his stables, and in the opposite direction from defendant's house; and that both Birchfield and Crider lived in Arbacoochie.

"*John Hearn* was then introduced as a witness for the defendant, and testified that, in March, 1874, he lived near Arbacoochie, about two hundred yards from the defendant; that on the night of the 3d March, 1874, he heard a woman scream at the defendant's house, and then heard a gun fire, and soon after another gun; that he started down to defendant's house a minute afterwards, thinking he had shot himself, and met defendant and his family half way between their houses; that he then turned back, and went to his own house, in company with defendant and his family; that defendant and his family passed by his house, going south; that defendant was barefooted, and witness did not know whether or not he had on a hat; that he heard the gun fire in a short time after the screaming; that he stopped a minute at his own door, and then went right on in the direction of the defendant's house, and met him and his family. Witness testified, also, on cross-examination, that he heard another person *holler* after the firing; that it appeared the person was moving—he said ' Oh, Oh,' and the sound of his voice was jolting, as though he was being dragged over cotton rows; that he met defendant, who was travelling faster than he was, and had gone about fifty yards further, a little over half way between their houses; and that he heard the

last screaming, or *hollering*, immediately after the firing of the gun. *James Roberts*, another witness for the defendant, testified that he knew defendant's character in the neighborhood for peace, and that it was good.

"*Martha Cunningham* was then introduced as a witness, who testified that, on the 4th March, 1874, she lived about a quarter of a mile from the defendant, and south of him; that she heard a noise in the direction of the defendant's house on the night of the killing, which appeared to be rocks hitting a house; that she then heard a person *hollering*, whom she took to be defendant's wife; that she heard a gun fire at the house, and then heard another person *holler*. On cross-examination, witness said, that she was at home when she heard the noise; that it sounded like rocks being thrown against the house; that she was certain she heard the noise; that it was about nine o'clock at night, and the wind was blowing in the direction of her house from the defendant's; that she had talked over what she knew in the case to defendant's wife several times, and also to defendant, and to other colored people in the neighborhood; that nobody but her children was at her house when she heard the noise; that they were all sitting around the fire at the time, and the door in the direction of the defendant's house was open. *Celia Cunningham*, another witness for the defendant, testified that she knew him, and lived about a quarter of a mile from him on the 3d March, 1874; that she heard, on the night of said day, a noise at defendant's house, which sounded like the throwing of rocks against the house; that she knew the voice of defendant's wife, and heard her *holler* before she heard the other noise; that she heard a gun fire after the said noise, and soon another gun fire, and then a different voice *hollering*. Witness also testified, on cross-examination, that she had talked over what she knew in the case several times with her mother, and 'lots of times' with the defendant; that she had been examined in the case before, and then swore that she heard rocks being thrown against the house, and that they made a 'lumbering noise.'"

"This being all the evidence," the court gave several written charges to the jury, at the request of the prosecuting attorney, among which are the following: "1. Malice, in law, does not denote general malevolence, or unkindness of heart, or enmity towards a single individual, but signifies the intent from which follows any unlawful or injurious act, committed without legal justification.' '8. While it is a principle of the law, that the necessity which will justify the taking of life need not be actual, and the slayer may lawfully act on appearances; yet, the law does not justify the taking of life,

unless the circumstances are such as to create in the mind of the slayer a reasonable belief that an imperious necessity then exists to take life, in order to prevent the taking of the life, or great bodily harm to the slayer.' ' 9. A mere civil trespass upon a man's house, not attended with such circumstances as would make it a breach of the peace, is not a sufficient provocation to reduce the killing of the trespasser to manslaughter, if committed under circumstances from which the law would imply malice, as with a deadly weapon.' ' 10. If the trespass is attended with force, the person assailed may repel force by force for the purpose of prevention and defense, but has no right to kill the assailant, unless it is necessary to prevent a felonious destruction of his property, or to defend himself against loss of life, or great bodily harm ; and if he kills the assailant, when there is not a reasonable ground to apprehend imminent danger of great bodily harm to his person, or a felonious destruction of his house, it is manslaughter ; and if done with malice, express or implied, it is murder."

The defendant excepted to each of these charges, and requested the court in writing, "in lieu of the 9th charge above copied," to instruct the jury as follows : "If the jury believe, from the evidence, that a crowd of men were on the defendant's premises, away from their usual place of residence, under circumstances so as not to be easily recognized, and attempted to assault the defendant, or any member of his family, or to commit a trespass to his property, it was a felony; or, if only one person was there under such circumstances, and attempted to assault, or did assault, the defendant or any member of his family, or trespassed upon his property, or attempted to do so, it was a felony; and the defendant had a right to use all the force necessary to prevent such assault or trespass, even to the taking of life." The court refused to give this charge, and the defendant excepted to its refusal.

The rulings of the court on the evidence as above stated, the charges given, and the refusal of the charge asked, are now urged as error.

SMITH & SMITH, HUDSON & TEAGUE, and R. S. HEFLIN, for the prisoner.—1. The admission of the testimony of Boman was erroneous.   An isolated fact was insufficient and incompetent to prove the character of the dog.—*Dupree v. The State*, 33 Ala. 380.

2. The 1st charge given by the court is erroneous.   However correct it may be in legal phrase, yet, when taken in connection with the evidence, it is an incorrect definition of

malice.—Bishop's Criminal Law, vol. 1, § 263. The inevitable effect of the charge was to mislead the jury; and hence it was not necessary to ask an explanatory charge.— *Eiland v. The State*, 52 Ala. 323. Under this charge, manslaughter is malicious; and the prisoner was on trial, under the indictment, as well for manslaughter as for murder. Under the influence of this charge, the jury may have increased the punishment which they would otherwise have imposed.

3. The 8th charge ought not to have been given. The testimony showed that the defendant's house was assaulted, while he and his family were within. He had the same right to defend his house and his family, or any member of it, that he had to defend himself; and this right was withdrawn by the charge from the consideration of the jury.—*Pond v. People*, 8 Mich, 150; *Shorter v. People*, 2 N. Y. 193; *Yates v. People*, 32 N. Y. 509; *Patten v. People*, 18 Mich. 314; *Carroll v. The State*, 23 Ala. 35; *Holmes v. The State*, 23 Ala. 17. The 10th charge is obnoxious to the same objections, while the 9th is altogether abstract, since there was no evidence tending to show a mere civil trespass on defendant's house.

4. Under the 3d section of the act approved Dec. 26, 1868, the act of Alsobrooks and his associates was a felony; and the defendant had the legal right to use all the force necessary to prevent the threatened commission of a felony.

JOHN W. A. SANFORD, Attorney-General, for the State.— 1. The charges of the court are fully sustained by the text-books, and by several decisions of this court, in which almost identical language is used.—1 Russell on Crimes, 483, *et seq;* 1 Bishop's C. L. § 263; *Carroll v. The State*, 23 Ala. 28–33; *Edgar v. The State*, 43 Ala. 52.

2. The evidence as to the defendant's dog was entirely outside of the issues, and could have worked no possible injury to him. It was, at most, error without injury.—17 Ala. 700; 31 Ala. 490.

STONE, J.—In inquiries of fact, dependent on circumstantial evidence for their solution, no certain rule can be laid down, which will define, with unerring accuracy, what collateral facts and circumstances are sufficiently proximate to justify their admission in evidence. Human transactions are too varied to admit of such clear declaration of the rule. Whatever tends to shed light on the main inquiry, and does not withdraw attention from such main inquiry, by obtruding upon the minds of the jury matters which are foreign, or of questionable pertinency, is, as a general rule, admissible evi-

dence.  On the other hand, undue multiplication of the is-
sues is to be steadily guarded against, as tending to divert
the minds of jurors from the main issue.—See *Campbell v.
State*, 23 Ala. 44.

In the present case, there seems to have been no dispute
that the defendant perpetrated the homicide charged against
him.  Justification or extenuation were the questions before
the jury.  As a general rule, no man is justified in taking the
life of another, unless there appears to him to be present,
imminent peril of life, or of grievous bodily harm, from which
there is no other reasonable mode of escape.  So, no homi-
cide is mitigated to manslaughter, unless the act is traceable
to blood suddenly maddened and heated beyond capacity for
deliberation, by a wrong suddenly inflicted, more grievous
than insulting language.  The law regards human life as too
precious, too sacred, to be taken away for light or trivial
causes.  The cherished instinct of self-preservation, or the
preservation of another's life, this, and this alone, amounts
to legal justification.  Reason dethroned by anger—deliber-
ation repelled—and this suddenly provoked by violence to
the slayer, or to his parent, wife, or child—this, nothing less,
mitigates homicide to manslaughter.  " Thou shalt not kill,"
and " vengeance is mine," is the language of the author of
our religion.

The confession of the defendant was given in evidence
against him.  In that confession, as testified to, the defend-
ant said his " dog barked, and about the same time a rock
struck the door " of his house.  Upon this statement of fact,
the inquiry naturally arises, was the rock thrown at the dog,
or at the house?  The record does not inform us whether
Alsobrooks was outside of the fence, or within the enclosure.
We suppose he was within.  If within, and if the dog was
fierce and inclined to bite, there is nothing more natural than
that he should seek to protect himself, by driving or fright-
ening the dog away ; and the fierceness or severity of the
dog, if such was his temper, would naturally call for more
vigorous defense against his assault.  We think the fierce-
ness of the dog should, and would, be taken into account by
the defendant, in determining whether a rock, or rocks
thrown, were intended as an assault upon his domicile, or as a
defense against the threatened attack of his dog.  The testi-
mony leaves us in doubt, whether Alsobrooks, the slain, was
alone, or whether others were with him.  If alone, and
menaced by a fierce dog, and, in this condition, the circum-
stances indicated that he was only defending himself against
the dog, the defendant's excuse for resorting to the use of a
deadly weapon comes with greatly impaired force.  In the

doubt and mystery which hang over the transaction, we can not say that the temper and fierceness of the dog presented an immaterial inquiry.

3. We do not consider the question before us as properly one of *general character*. General character is predicable of accountable moral intelligences. Instincts, habits, tendencies, natural inclinations, are the attributes of the brute. That a dog is fierce, or inclined to bite, is a fact susceptible of direct proof; and such fact can be known, only by observing his conduct in similar conditions. To prove such disposition, it is not necessary that it should have become notorious, or generally understood in the neighborhood. What the witness testified, was simply the affirmation of a fact, based on his own observation and knowledge; and we think the Circuit Court did not err in allowing it to go to the jury.

. 4. The charges given correctly define the crime of murder, and malice as an ingredient thereof. They also correctly declare the general doctrine of self-defense. The principles they enunciate are substantially copied from the language of this court in several well-considered opinions.—See *Oliver v. The State*, 17 Ala. 287; *Carroll v. The State*, 23 Ala. 28. The same doctrine is asserted, in substantially the same language, in the text-books.—Wharton's Amer. Cr. Law, §§ 1019, 1020; 1 Bish. Cr. Law, 3d ed., § 636. It is contended, however, that the language of the charge numbered 8 is too restricted, in this, that it excludes from the consideration of the jury the well-defined right to take life in defense of one's wife, child, &c., on the same conditions as those which justify a resort to this extreme measure in defense of one's self. The language of the charge is, "The law does not justify the taking of life, unless the circumstances are such as to create in the mind of the slayer the reasonable belief that an imperious necessity then exists to take life, to prevent the taking of the life of, or great bodily harm to the slayer."

The language of this court, in *Carroll v. The State*, is, "If he" [the prisoner] "kills when there is not a reasonable ground of apprehension of immediate danger to his person or property, it is manslaughter; and if done with malice, express or implied, it is then murder." WHARTON, in his excellent treatise on Criminal Law, § 1014, says: "It is not to the protection of self that the law of self-defense is confined. With the same limitations as those above given, master and servant, parent and child, husband and wife, killing an assailant in the necessary defense of each other respectively, are excused; the act of the relation assisting being construed the same as the act of the party himself." It will thus be seen that the right to defend one's wife, child, &c., is but a

[Mattison v. The State.]

species of self-defense.   If there were any thing in this record which tended to show that the wife of the prisoner was assaulted, or exposed to any separate or peculiar peril, independent of, or greater than the alleged danger to which the prisoner was himself exposed, we might feel it our duty to hold, that the charge given denied to the defendant one legitimate ground of defense or extenuation.   But there is no such testimony.   The bill of exceptions recites that it contains all the evidence.   We can not suppose there was any thing in the case, which made it the duty of the court to explain to the jury that phase of the doctrine of self-defense which takes in the wife, child, &c.   Sufficient for this trial to state the general principle, without embarrassing the jury by the presentation of exceptional principles of law, which the testimony did not call into exercise.   A charge, which correctly declares the law applicable to every hypothesis of fact justified by the evidence, is not only free from error, but is greatly preferable to one which goes beyond the evidence, and deals in abstractions.   There was no error in the charges given.

We do not think the testimony in the cause authorized the giving of the charge asked, even if that charge be free from error.   The testimony does not tend to bring the case within the act of December 26th, 1868 (Pamph. Acts, 445), even if all the provisions of that act be constitutional.   It may admit of doubt, whether the clause of the third section of said act, which provides for persons acting "without disguise," is sufficiently expressed in the caption of the act to bring it within the requirement of the second section, fourth article, of the constitution of 1868.   We deem it unnecessary, however, to decide this, as we do not think the testimony tended, in the slightest degree, to show that the deceased, or any one with him, had begun "to demolish, pull down, set fire to, or destroy" any "building used for private or public use."   The charge was abstract, and was rightly refused for that reason, if for no other.

Judgment of the Circuit Court affirmed.