THE STATE v. ANDERSON, *Appellant.*

1. **Criminal Law**: MURDER: INDICTMENT. An indictment for murder which alleges that the defendant with a certain club gave the deceased one mortal wound on the "head and body," is not for such repugnancy fatally defective under the provisions of the statute of jeofails. (Revised Statutes, 1879, sec. 1821.)

2. ——— : ——— : DEGREE OF CRIME. Where the guilty agency of the accused in causing the death of the deceased is established, and nothing further, then the law will presume that the crime was murder in the second degree. But where the nature of the wound inflicted, the weapon used, with its previous selection and preparation, together with all the evidence, show a deliberate killing, it is murder in the first degree, and in such case, where there is on countervailing evidence, an instruction for murder in the second degree should not be given.

3. ——— : ——— : ———. One who kills his wife who was unfaithful to her marriage vows, he believing such to be the fact, and for that reason killed her, or who killed her because of jealousy he entertained toward her, is guilty of murder in the first degree.

4. ——— : AFFIRMANCE OF JUDGMENT: EXECUTION. When the judgment is affirmed in a criminal cause, on appeal to the supreme court such court will direct the sentence pronounced to be executed. (Revised Statutes, 1879, sec. 1994.

*Appeal from St. Louis Criminal Court.*—HON. J. C. NORMILE, Judge.

AFFIRMED.

DR. Lutz, who made the *post mortem* on the body of the deceased, testified to the wounds on the head, which could have been made by a blunt instrument, such as a wooden club which was shown him, and that it was likely that death would result from such wounds almost instantly.

Police Sergeant Boyd states he first saw the defendant at the police station at 7:25 on the morning of the

The State v. Anderson.

ninth of August; that the defendant walked into the office and said in response to questions put, substantially as follows: "I came here to give myself up; I have killed my wife; I am tired of the way she has been acting; I killed her with a base ball bat; I had been out the night before looking for her." Witness did not exactly remember whether defendant said his wife came home, or whether he brought her home, but next morning defendant arose about five o'clock and she was asleep at the time, either on a pallet or on a bed. Defendant told witness that he drew the sheet over her head, and took a base ball bat and mashed her over the head; he did not know how many times he hit her; he hit her until he thought he killed her; defendant then left the house and stopped at a lady's house, telling her to go and take charge of the child at his house, which was an adopted child; defendant said he contemplated suicide by drowning himself, but on second thought he came to the police office to give himself up; defendant said he lived at 2514 North Broadway, in rear, second floor; that is where his wife laid now; "the base ball bat is in the room; I prepared it two or three days previous; I contemplated killing this woman for the way she had been acting; that she was not doing right."

Witness did not visit the premises but saw the body at the morgue; saw the base ball bat afterwards at the coroner's inquest, and defendant identified it as the bat he killed her with. Witness further testified that when defendant came into the police office, defendant walked in cool and unconcerned, but did not know whether defendant was under the influence of drink; he may possibly have had a drink. Defendant was locked up by witness. Witness was present at the coroner's inquest, when defendant identified the dead body as that of his wife. On cross-examination, witness said defendant, when he came into the office, did not seem to be very

sober, nor tolerably under the influence of liquor, but witness did not think he smelled liquor on him; but seemed to be perfectly cool and collected, and in response to a question asked by Boyd, said: "I understand what I am doing and what I am saying."

Hugh O'Neil, a police officer, stated that he saw defendant in the calaboose, and had a conversation with him in Sergeant Boyd's presence; defendant identified the club with which he killed his wife; defendant said his wife had been acting very badly, acting as a prostitute; he pleaded with her to stop it; he pleaded more as a father than as a husband, but she would not stop it; but finally he could not stand it any longer, and he killed her. On cross-examination witness said that defendant said that he had found a postal card from some man wanting her to meet him, and that he begged her not to go, and she said she would go, and kept on going. The circuit attorney here offered the club in evidence.

Annie Eberhard, living at 1821 North Ninth street, in August, 1888, knew defendant and his wife; they were living together; had no children, but had an adopted child living with them; the child was three or four years old. On the morning of the killing, defendant came to her house, telling her what he had done, and asked her to go and see to his wife, so he could get away; he killed her. This was about six o'clock in the morning. He then went away. "I went to the fourth district police station, and an officer went with me to Anderson's house. We found her on the floor dead; the quilt was over her face; we could not see her face. I took the child, and took him down stairs. The child was laying beside her, asleep. The woman was dead."

On cross-examination: "Anderson often came to my house; his wife, not much. Anderson was a nice, quiet, industrious, hard-working man and quiet; I had never known him in trouble the ten years I knew him; he treated his wife very kind; I heard it in his house; he asked her to be a good woman and stay at home and

behave herself; he often complained to me that she was going out every night; that was the whole time I knew him, when they were living together as husband and wife; he was a hard-working man, did what labor men can do; he was very handy at anything; he supported his wife. A short time before the killing he was sick for about a month; he had been working for Bishop, and the stove fell on him; he was not able to work; they had but one room, it had two beds; I examined his bed; it had not been occupied; it was made up; nobody had slept in it; the other bed was all disturbed; her clothes were laying there as when she came home that night; I saw something wrong with this man's mind, he often acted strange when he was in my house; he 'feeled' funny, like he was out of his mind over this woman; sometimes he would come in and talk a word and then he jumped up and went out again; act so silly, so foolish; he did that way all last winter; most all the time I talked to him; I seen him nearly every day last winter; he talked about his wife going out and about her staying out in the night, and she never made any meals and nothing for him at all, and he had to take care of the house and the child, and wash for him too; she never would stay home and do anything; he told me his wife was once arrested for going with other men in the night; she said she had been arrested for going with the men; I asked her; I saw him three days before the killing; he acted very strange; he had no rest, he was uneasy, restless; he was not right in his mind; he was like a crazy man in his head, over the trouble he had."

On behalf of defendant. Gustave F. Bauer, a grocer, testified to the good character of defendant; that the wife's reputation was not good; "I saw him frequently; the last time he was in my store he grieved himself greatly, worried himself about his wife; I thought when he was gone the man acted very funny; he was very much worried about the woman; this was

two or three years, maybe; he and his wife were together in my store often and I saw he treated her kind in my presence; I heard from different parties his wife's reputation for morality was bad—from people who knowed the parties; I heard it in my store; her neighbors been telling she was out often whole nights."

Henry Fehr said defendant sometimes worked for him; that he was a good, honest workman.

Julia Hughes, a married lady, lived in the next yard to the Andersons; "he was a peaceable and quiet man; every one thought he was nice and quiet; I always thought he treated his wife good; I never heard him quarrel, or say a cross word to her; I heard him often talking to his wife; one evening he said to her: 'Why don't you stay at home and keep your house clean, like that woman down stairs? You go out all the time. I'd rather you stay at home and cook something than to go the way you do.' I often heard the neighbors speak about her; they would say 'she runs so much.'"

Mathew Walker, a neighbor of defendant, said: "His general reputation is very quiet, hard-working, industrious man; his wife was a woman that would run around among men; that was her reputation; everybody around there knew her to be a very common woman of that kind; a woman that everyone knew; that would run at night with men, with anybody and everybody; I saw her in company with men most any time; her husband was not there in the daytime; she hardly ever had any lady company; she had great many gentlemen visitors; strange men, all strangers to me; I heard her husband trying to get her to stay at home; several days before her death I heard him talking to her, trying to get her not to go off on an excursion that was going up the river; I heard she was arrested once; I didn't see her arrested; but I know she was away from home

several days ; at times Anderson would not act as well as he did at others ; at times he would sit and cry, and you could not find out what he was crying about ; he was crying the day before the death of his wife ; I have noticed him several times before ; in my opinion he was not right ; he would talk foolish at times ; his principal talk all the time was about him and his wife, her troubles, how they would get along and her running around ; I saw this club on the day she was murdered, never before ; I knew him to collect wood and coal on the railroad very often ; in pleasant weather, every night, I sat in an old wagon in front of his door ; the night preceding the killing he came out and said he was going to look for his wife ; I did not see him afterwards."

William Anderson, the defendant, on his behalf, testified he was fifty years old, born in Denmark, was in this country twenty-two years, and lived in St. Louis eleven years. At one time he moved away to Fort Chartres, Illinois, stayed there a year, and returned to St. Louis ; first met his wife at the Woman's Guardian Home ; he was introduced to her by the mother of Charles P. Johnson ; got married, went to housekeeping ; had no children, but adopted a child ; "it was two weeks old when I got it, it is now three years and seven months old.; the killing happened as near as I can remember in the morning about five o'clock, I should think ; I had been to bed, I had not undressed ; I laid on top of the mattress, throwed myself crosswise over the bed ; my wife had been down town that night ; I got home towards morning ; I was at the house the evening before, at our room, my wife was there ; she left before dark, at about seven o'clock ; she did not say where she was going ; she went down town all the time ; I left the house after I put my little baby asleep ; that was about ten o'clock ; I then went down, too ; I went down to Fourth and Chestnut ; I went down to the Bethel

Mission Home on Olive street and · Commercial alley, I went to Clark avenue, from there I went down to Second street, Second and Cedar, between Plum and ˙Cedar; there is a place by the name of Mrs. Nagle where she used to go that I heard of on South Second street, and I went there to look for her, and not finding her there, I found her on the west side of the street as you go down town between Plum and Cedar, in a coal office, in a coal yard; I found my wife there in company with a half-a-dozen men; I saw her there; I could not be mistaken; I called her; she did not answer me, and a couple of men came towards the gate; then I went away; I went to the corner of Cedar and Second, into a saloon, drank a glass of whiskey there; then I went out again and waited for her; I thought if I could see her alone, I could get her home; I waited a long while there; of course I was afraid to go back, there was too many men there; I waited a couple of hours; I went a couple of times in the saloon; when I went back to the gate, my wife was gone and the men also; I don't know what I did after that, before I went home, I can't say where; I strayed around in the city, but I got home sometime towards morning, so far as I know; then I laid myself down on my bed crossways, I was tired out; I threw myself crossways over my bed in my clothes, the way I was, and sometime in the morning I woke up, I suppose, if I was dozing asleep, I don't know, and then I suppose I took hold of the first thing I got hold of and committed the deed; and then after it was committed, of course, when I came to my senses, I was standing looking at my little child, and it was laying sleeping there, and I didn't know what to do with it; then I made up my mind to go to that lady and have her take care of it, and give myself up, and whilst I stood and looked at the child, I throwed the second cover over her; I suppose this is the club; I got it in the wood laying alongside my stove, I suppose; I don't know how long I had it; I was in the habit of gathering wood all the time, all I

used ; I gathered all I used on the railroad ; I never saw this club before and have no recollection of getting it out of the woodshed, or any place else, for the purpose of striking my wife, and don't when I got it ; I did not get it with any idea of striking or killing my wife ; I never had any idea of striking her because I loved her ; I never had any idea of killing her ; I didn't know I wanted to kill her ; I did not think anything about killing her when I was hunting for her that night ; but I was trying to tackle some of them men ; I wanted to take her home ; that is the reason I was waiting down there ; I came to my senses when I saw my child laying there ; I did not know what I was doing that night ; it seems a blank to me ; I don't recollect anything of it ; I had four or five drinks, ponies, that night ; I took those drinks while I was hunting for my wife, walking around the streets ; I do not know when I got home, or when my wife got home ; I don't know how long afterwards I struck her, I have no recollection ; my wife was in the habit of going out at night, sometimes two days and one night, and sometimes two nights and one day ; I remember one particular night when I asked her when she was going away— I was not expecting her to go, and I says, 'Della, where are you going?' 'Well,' she says, 'none of your business ;' then another time, if I asked her where she had been when she came home, she would laugh in my face and would not answer me ; I talked with her about going out; I reasoned with her many a time, a hundred times : I never caught her in company with men myself before this night; I never attempted to, I never followed her with that intention ; and never followed her until that night; I moved a great many times from where I lived ; I did it to get her away from those acquaintances ; I moved half a dozen times I guess ; I moved out of the state once, to Fort Chartres, Illinois ; and that was my idea in moving there, to get her away ; she did not live with me all right down there, she carried on in the same way ; I came back to St. Louis, and

lost track of her for two years; then she left me; I then met her on the street one day without a home, and I took pity on her again, and I said 'If you will do better and be a good woman, you can come home again;' that was about seven years before she died, as far I recollect; I did not know her character before I married her; I have seen my wife since she died; she appeared to me as a spirit, in my cell, two weeks after I was locked up; I am sure of that, I can lay my hand on the Bible, and swear that I know it; that is the only time she appeared to me, she said nothing at all; it woke me up; it was in the middle of the night, as far as I can judge; I had been asleep; I do not recollect how long this piece of wood had been in my house, it came in as kindling wood; I gather kindling wood about every day, if I had little time; sometime at noontime, between twelve and one, and sometime in the morning before seven."

Cross-examination: "I worked as a gardener in the Woman's Guardian Home; it is a home for fallen women; she was an inmate of it; they say I made a statement at the coroner's inquest; I don't recollect what I said; I don't know; it is what the papers state; that is all I know of it; I have no recollection of having made a statement; I have a faint recollection that I was at the coroner's inquest; I recollect walking into the central station and surrendering myself to Sergeant Boyd; it is like a dream to me."

(Then follows a series of questions put to the defendant interrogating him as to whether certain statements alleged to have been made by him at the coroner's. inquest were actually made by him at that time, to all of which his answers were, "I don't know, sir.")

Witness continues, "I did not get drunk so I could kill her; as time passes my memory increases in strength; I never got the club for the purpose of killing my wife; I never sawed the ends off that I recollect."

John A. Robinson, a stenographer, stated he acted as stenographer at the inquest of the deceased, and said defendant made a statement there under oath. Witness then read the statement of the defendant made before the coroner, which, in substance and effect, was this: That he had killed his wife with a club at five o'clock yesterday morning while she was asleep in bed; that he hit her three times; that the first blow knocked her unconscious; that before striking her, he placed the spread over her head so she could not see him; that he was half drunk; that he must say he took the liquor purposely; that he knew what he was doing; that his wife would not listen to him any more and he could not do anything with her." He further said: "I am sorry I did it, gentlemen, but I am glad she is dead, I am glad she is dead, there won't be any other men running after her to tumble her down where she was." Replying to a question asked him by a juror whether he should have had nerve enough to have killed his wife had he remained sober, he said: "No, sir, if I had been sober I could not have done it." And being further asked by the juror if he got drunk on purpose to kill her, he answered: "Yes, sir, I did, I speak the truth before God."

*Thomas B. Estep* and *L. A. Steber* for appellant.

(1) The allegation in the indictment of the stroke upon the "head and body" of the deceased of "one" mortal wound is fatal to the indictment. *Long's Case,* 5 Coke, 120; *State v. Edmundson,* 64 Mo. 398. (2) From the act of killing alone, the law presumes it to be murder in the second degree. *State v. Gassert,* 65 Mo. 352; *State v. Foster,* 61 Mo. 549; *State v. Hudson,* 59 Mo. 135; *State v. Holme,* 54 Mo. 153; *State v. Testerman,* 68 Mo. 408; *State v. Lane,* 64 Mo. 319 (321–322). (3) But as the law presumes the admitted killing to be murder in the second degree, the state must

show wilfulness and deliberation in order to raise it to murder in the first degree. *State v. O' Hara*, 92 Mo. 59 ; *State v. France*, 76 Mo. 681 ; *State v. Lane*, 64 Mo. 319. (4) Instruction number 4 is bad, and is not cured by the fact that instruction number 1 properly defines what is murder in the first degree. *State v. Mitchell*, 64 Mo. 190; *State v. Dearing*, 65 Mo. 530; *State v. Simms*, 68 Mo. 305; *State v. Hill*, 69 Mo. 451; *State v. Pacquett*, 75 Mo. 330; *State v. McNally*, 87 Mo. 644. (5) Provocation is also set up as a defense in this case. Dishonor is recognized by the law as one of the strongest provocations that can be given, and may reduce the degree of the crime. Wharton on Homicide (2 Ed.) p. 322, sec. 407 ; *Maddy's Case*, 1 Ventr. 158 ; *Pearson's Case*, 2 Lew. 216 ; *People v. Horton*, 4 Mich. 83 ; *Maher v. People*, 10 Mich. 212 ; *Com. v. Whiller*, 2 Brewst. 388.

*John M. Wood*, Attorney General, and *Ashley C. Clover*, Circuit Attorney, for the State.

(1) The indictment is in the approved form, charges every essential element of murder in the first degree, is technically correct, properly signed and endorsed. (2) No exceptions were saved during the trial to any admission or rejection of evidence. (3) It is clear that upon the evidence there could not be any instruction warranted for a less grade of homicide than murder in the first degree. There was no testimony whatever of any provocation or passion recognized by the law. The circumstantial evidence establishes a most cold-blooded and deliberate murder if the prisoner was sane. (4.) To reduce the killing of an adulterous wife to manslaughter, because of her adultery, the husband must detect her in the act. 2 Bishop Crim. Law, sec. 638 ; *State v. France*, 76 Mo. 681. (5) The instructions for murder are in the approved form.

SHERWOOD, J.—The defendant was indicted for the murder of his wife ; the indictment charging that he had killed her on the ninth day of August, 1888, by striking her with a large club.   The result of the trial was a verdict of murder in the first degree, the trial court refusing to instruct on any other degree, but instructing also on insanity.   The statement of defend-fendant's counsel, which accompanies this opinion, supplemented by some additions and corrections I have made, furnishes the evidence of this cause in substance, and all that is necessary for understanding all the legal points arising upon that evidence.

I.   The sufficiency of the indictment has been questioned ; it alleges that the defendant gave the deceased, with the club aforesaid, one mortal wound on the "*head and body.*"   This repugnant allegation, it is claimed, renders the indictment fatally defective.   This contention would doubtless have prevailed at common law, but such objections are of no avail under our practice and statutory provisions.   *State v. Edmundson*, 64 Mo. 398 ; *State v. Draper*, 65 Mo. 335 ; R. S. 1879, sec. 1821.

II.   The most important question, however, which this record presents is whether the court should have given an instruction upon murder in the second degree. It has been frequently ruled by this court, that where the guilty agency of the accused in causing the death of the deceased is established, and nothing further, then the law will presume the crime was murder in the second degree ; but in the case at bar there are abundant circumstances showing something more than a mere intentional killing.   The nature of the wound inflicted, the weapon employed to inflict them, the previous selection and preparation of that weapon, the defendant's repeated confessions of the homicide with all attendant particulars, leave no room to doubt that the crime was nothing less than murder in the first degree.   And his testimony does nothing to overthrow, controvert or countervail those confessions in the slightest degree.

The State v. Anderson.

His general replies in regard to them are, "I don't know," "I don't recollect what I said." The insufficiency of such replies to contradict what he had previously confessed and testified, is too apparent to require more than a bare statement. The trial court was therefore entirely correct in declining to instruct on any other grade of murder than the facts aforesaid warranted. If the testimony of the defendant had been in direct contradiction of what the other witnesses testified ; if his testimony had made out a case proper for an instruction for murder in the second degree or even a lower degree of homicide, such instructions should have been given as being necessary to a full exposition of the law governing the case ; and as enabling the jury to properly perform their duty in making up their verdict ; but no such testimony having been introduced, the action of the trial court must stand.

III. The claim is made that instruction number 4, as it is called, conflicts with a previous instruction properly defining murder in the first degree. It may be said that, as presented in the record, the instructions are not numbered, but if they were there is no such conflict as that supposed. The instruction condemned does not, when properly considered, conflict with a former instruction though not very happily worded, but its evident design and purpose was to inform the jury in effect and in addition to their previous information, of the presumption of the nature of the intention the law attaches to the use of a deadly weapon, and of an intent to kill being one of the ingredients of murder in the first degree ; but this statement by no means conflicts with a previous instruction or a former part of the same instruction, if but one instruction was given ; both the instructions or both clauses of the same instruction can stand together.

IV. There is no fault in instructing the jury that if the deceased was unfaithful to her marriage vows, and

defendant so believed and so believing killed her, or if he killed her because of jealousy he entertained towards her, then he is guilty of murder in the first degree; for this is simply the theory of the law,—as is attested by all the authorities treating of the subject. There is abundant evidence to support the theory of this instruction.

As the result of our views, it must be held that the judgment be affirmed, and accordingly we direct the sentence pronounced to be executed. R. S. 1879, sec. 1994. All concur.