THE STATE v. BULLING, *Appellant.*

,IN BANC.

1.   **The Decision in Case** of *State v. Jackson, ante,* p. 196, sustaining the validity of the constitutional amendment increasing the number of judges of the supreme court affirmed.

2.   **Practice, Criminal:** VOID ORDER FOR ELECTION OF SPECIAL JUDGE: AUTHORITY OF REGULAR JUDGE TO MAKE PROPER ORDER. Where the regular judge, on account of affidavit of prejudice against him, made an order for the election of a special judge to try defendant's application for a change of venue, which application the special judge, when elected, refused and proceeded to try the cause, the judgment being reversed and the cause remanded in the appellate court upon the ground that the order was void because not made for the election of a special judge to hear the application for a change of venue and to try the cause, upon the return of the case to the trial court the regular judge had authority to make the proper order for the election of a special judge.

3.   ———— : DELAY IN TRYING ACCUSED : DISCHARGE OF DEFENDANT : STATUTE. The terms of court occurring during the pendency of an appeal cannot be computed under Revised Statutes, 1889, sections 4222, 4225, providing that if a person indicted and committed to prison be not brought to trial before the end of the third term he shall be entitled to be discharged ; and this is true although the trial resulting in the judgment from which the appeal was taken was *coram non judice* and void.

4.   ———— : MURDER IN FIRST DEGREE : INSTRUCTION. Where the evidence proves a defendant guilty of murder in the first degree, unless he was insane at the time of the commission of the homicide, and the court correctly instructed upon that degree of murder, a second instruction authorizing a conviction of murder in the first degree or a finding of insanity which leaves out the elements of deliberation, premeditation and malice aforethought is harmless, even if erroneous.

5.   ———— : HARMLESS ERROR : INSTRUCTION. An instruction for a lower grade of homicide than is warranted by the evidence cannot prejudice the defendant, and is harmless error.

6.  ——: MURDER IN FIRST DEGREE. The killing of a wife by her husband because of her conduct toward him twenty-four hours before the homicide, or because of information of her public misconduct the night before, imparted to him half an hour before the homicide, constitutes murder in the first degree, unless excused on the ground of insanity.

7.  ——: INVOLUNTARY MANSLAUGHTER. Where the evidence on a trial for murder shows that the defendant intended to kill, if he was sane at the time of the homicide, an instruction for involuntary manslaughter under Revised Statutes, 1889, section 3471, should not be given, notwithstanding defendant testified he did not intend to kill.

8.  ——: ——. The question of an involuntary homicide committed in a heat of passion, as meant in Revised Statutes, 1889, section 3471, should not be submitted to the jury, where there is no evidence proving or tending to prove any lawful provocation.

9.  ——: ——: PROVOCATION. The terms "legal," "lawful," "adequate" and "reasonable," when used as adjectives qualifying "provocation" are synonymous.

10.  ——: ——: ——. As a general rule it requires an assault or personal violence to constitute a lawful provocation.

11.  ——: PRACTICE: IMPROPER CONDUCT OF JUDGE. A defendant, who desires to have the conduct of the court in interrupting the argument of his counsel reviewed in the appellate court, should preserve in the bill of exception what he said in argument and what the court said in interrupting him. It is not sufficient to alone make it a ground for new trial in the motion for new trial.

*Appeal from Andrew Circuit Court.*— HON. C. A. ANTHONY, Judge.

AFFIRMED.

*Wm. B. Sanford* and *David Rea* for appellant.

(1) The order of the regular judge, of December 4, 1889, for the election of a special judge to try the case and pass on the application for a change of venue was a nullity and void. R. S. 1889, sec. 4176 ; *Lacy v. Barrett,* 75 Mo. 469. (2) The election of Judge JOSEPH P. GRUBB as special judge, in pursuance of the

said order of December 4, 1889, was a nullity and void, and did not legally invest him with judicial power and authority, and he consequently could not grant a change of venue in the case. *Lacy v. Barrett*, 75 Mo. 469. (3) The circuit court of Andrew county 'had no jurisdiction of this case, because the change of venue to it was not granted by competent judicial authority. (4) The circuit court of Andrew county, if it had jurisdiction, should have discharged him on his motion, because five regular terms of court had been held since his indictment without his having been brought to trial, the delay not having happened on his application for continuance, nor for want of time to try the cause. R. S. 1889, sec. 4222; 65 Mo. 29; *State v. Bulling*, 100 Mo. 87. (5) The court erred in giving instructions for the state and particularly in giving instruction, numbered 3. *State v. Hill*, 69 Mo. 457; *State v. Mitchell*, 64 Mo. 191; *State v. Pacquet*, 75 Mo. 330; *State v. McNally*, 87 Mo. 644; *State v. Melton*, 67 Mo. 594; *State v. Williams*, 69 Mo. 110; *State v. Bohannon*, 76 Mo. 562. (6) When a defendant testifies that he did not intend to kill deceased, as defendant did in this case, he is entitled to an instruction for a lower grade of homicide than murder in either degree. *State v. Palmer*, 88 Mo. 568; *State v. Banks*, 73 Mo. 592; *State. v. Gassert*, 65 Mo. 352; *State v. Partlow*, 90 Mo. 608; *State v. Wilson*, 85 Mo. 134. (7) The court erred in failing to instruct the jury on the subject of just provocation; the passion which will deprive a homicide of the element of deliberation, and thereby reduce it below murder in the first degree, may result from some cause short of what is known as lawful provocation. *State v. Ellis*, 74 Mo. 207; *State v. Lewis*, 74 Mo. 222; *State v. Hill*, 69 Mo. 451; *State v. Stephens*, 96 Mo. 637. (8) The court erred in interrupting defendant's counsel in the midst of his argument. *Kelly v. Boland*, 78 Ill. 438; *Furhman v. Huntsville*, 54 Ala. 203.

*John M. Wood*, Attorney General, for the State.

(1) The third instruction on the part of the state properly declared the law. *State v. Anderson*, 98 Mo. 461. (2) No error was committed in refusing instruction, numbered 6, asked by defendant, as to manslaughter in the third degree; there was no evidence on which to predicate such an instruction. (3) The instructions on behalf of the defendant in relation to insanity, and the credibility of the witnesses, follow approved precedents. *State v. Pagels*, 92 Mo. 300; *State v. Bryant*, 93 Mo. 273; *State v. Redemeier*, 71 Mo. 173. (4) The fifth instruction on behalf of the defendant was in proper form by section 3477, Revised Statutes, 1889. While we have been unable to discover any evidence in the record warranting this instruction, yet, as it was in defendant's favor, he cannot complain. (5) The instructions given by the court on the part of the state, and the two given on the part of the defendant, covered the whole range of the controversy, and there was no error committed by the refusal of the other instructions asked for by defendant. Defendant was either guilty of murder in the first degree or guiltless by reason of insanity, and instructions as to murder in the second dgree and as to manslaughter were properly refused. *State v. Bryant*, 93 Mo. 273; *State v. Lowe*, 93 Mo. 547. (6) As to the improper action of the court in interrupting counsel for the defense while they were making their arguments to the jury, which is alleged in the motion for a new trial, there is no evidence that the court exceeded its authority or was guilty of any conduct prejudicial to the defendant. The motion does not prove itself. *State v. McDaniel*, 94 Mo. 301.

SHERWOOD, C. J.—For the reasons given in *State v. Jackson*, *ante*, p. 196, we approve the judgment of division number 2 of this court. All concur.

DIVISION TWO.

THOMAS, J.—The defendant was indicted in the criminal court of Buchanan county at its March term, 1888, for the murder of his wife, Flora Bulling. At the same term he filed an application for a change of venue from the county on account of the prejudice of the inhabitants thereof, and also an affidavit supported by two witnesses that the judge was so prejudiced against him that he would not impartially decide his application for a change of venue. The court immediately made an order that a special judge be elected to decide defendant's application for a change of venue.

FIRMIN S. WINN, Esq., was elected special judge, and he overruled the application for a change of venue, and then proceeded to try the case upon its merits, which resulted in the conviction of defendant for murder of the first degree, and his sentence to death. The trial occurred in April, 1888. These proceedings were had prior to the enactment of the present statute in regard to change of venue on account of prejudice of the people. Then the judge heard the evidence and determined the issue of prejudice or no prejudice. In 1889 the statute was so amended that the judge has now no discretion in the matter, if the defendant will make affidavit, supported by two credible witnesses of the county, that the people are prejudiced against him to the extent that he cannot have a fair and impartial trial. He took his appeal to this court from the sentence against him in 1888, and the case was reversed and remanded upon the ground, that Judge WINN had not been legally elected special judge; indeed, that his election and qualification were so irregular that he was not authorized to try the case, and what he did was *coram non judice*, and, therefore, void. *State v. Bulling*, 100 Mo. 87.

When the case got back to the criminal court of Buchanan county, the defendant on the third day of

December, 1889, filed written objections to the regular judge of said criminal court, Hon. SILAS WOODSON, entering any order or exercising any judicial power in the case, because he had made one order for the election of a special judge, and, when that order was entered, his functions as regular judge in that case ceased ; but Judge WOODSON made another order for the election of a special judge to decide the application for a change of venue and to try the case, and Hon. JOSEPH P. GRUBB was duly elected, took the oath required by law and granted a change of venue in the case to Andrew county, the defendant having complied with the statute on the subject of change of venue as amended in 1889. To this action of the court defendant duly excepted.

Hon. CYRUS A. ANTHONY was the regular judge of the circuit court of Andrew county, and there was no objection made against him on the score of prejudice ; but defendant filed his motion in the Andrew circuit court under section 4222, Revised Statutes, 1889, asking for his discharge because five terms of the said criminal court had been held since his indictment, and he had not been brought to trial, and that the delay had not happened on the application of defendant for a continuance, or been occasioned for want of time to try the case. This motion was overruled, and defendant excepted. A trial was had in May, 1890, in the circuit court of Andrew county, and resulted again in the conviction of defendant of murder of the first degree and his sentence to death, and the case is here by appeal for the second time, and his counsel argue with much earnestness and ability that the case ought to be reversed and the defendant discharged : *First*. Because the order made by Judge WOODSON in December, 1889, for the election of a special judge was utterly void, and, *second*, because five terms of the Buchanan criminal court elapsed, before his being brought to trial without any fault of his.

I.   As to the first point we hold that Judge WOOD-
SON had jurisdiction to make and enter the order he
did.   This court held when the case was here on the
first appeal that the court below had no authority to
order the election of a special judge "to decide defend-
ant's application for a change of venue" only, and this
having been done the order was void and conferred no
jurisdiction on the special judge elected thereunder to
either decide his application for a change of venue
or to try the case, and, when the case reached the said
criminal court, the judge proceeded to do what this
court decided he ought to have done in March, 1888,
that is, make an order for the election of a special
judge to decide the application for a change of venue
*and* to try the case.

If the defendant's contention be tenable the *status*
of this case would be most remarkable.   Indeed, it
would be *in limbo*.   Special Judge WINN had no
authority to do anything in the case, as was specially
decided by this court, and, if Judge WOODSON had no
jurisdiction to do anything in it, we would have the
remarkable spectacle presented, of a court having by
its errors environed itself and tied its hands so that it
could move neither up nor down, go forward nor retreat.
It would have to stand still, and leave a case on its
docket undisposed of, and having no power to either
try it, have some one else try it, or even strike it from
the docket.   It is scarcely conceivable that any such
absurd result could arise under our system of laws.
To avoid this *reductio ad absurdum* the defendant's
counsel argues that the clerk of said criminal court
*might* have power to proceed and elect a special judge.
They do not even concede this, but suggest it as a pos-
sible escape from the awkward dilemma, in which the
case would be placed, if it *be untried and untriable*.
Counsel rely on the opinion in the case of *Lacy v. Bar-
rett*, 75 Mo. 469, as sustaining their view that Judge
WOODSON had no jurisdiction in December, 1889, to

make the order for the election of a special judge, and as giving color to the suggestion, that the clerk *might* act. We do not concur with counsel that the *Barrett case* teaches any such doctrine.

In that case the judge made an order for the election of a special judge in the proper form, and, when JAMES G. BLAIR was elected special judge, the regular judge decided BLAIR was incompetent to sit in the case, because he had been an attorney in it, declared the election void and directed another election to be held. On this state of facts, Judge HENRY, speaking for the court, said: "If Mr. BLAIR had been of counsel in the cause, and either party had for that reason been unwilling that he should preside at the trial, the objection should have been made to the clerk whose duty it was to hold the election, and under section 4 another election could have been held, and so from time to time until a suit-able person was chosen who could and would have pre-sided * * *. It was for them [the attorneys] and not the judge to raise the question."

There the regular judge made the *proper order* for the election, and then his duties and jurisdiction ceased; but he interfered in the election which he had no author-ity to do. The election was wholly under the control of the clerk after the order for the election was made. It is true Judge HENRY, in the *Barrett case*, held that, under the act of March 9, 1877, no order of the judge was req-uisite, but when his disqualification was announced the members of the bar might proceed to elect a special judge without any order of the court whatever. But that was in a civil case, and the reading of the act above cited and of section 3323, Revised Statutes, 1889, being section 1107, Revised Statutes, 1879, which has reference to civil cases alone, is radically different from section 4175, Revised Statutes, 1889, being section 1878, Revised Statutes, 1879. In the former case the judge was not, and is not, directed to make an order for the election of a special judge, while in the latter case he is.

In criminal cases the clerk cannot, and never could, hold and conduct an election for a special judge without an order first entered of record by the court, directing and authorizing it. This very point was decided in this case on the former appeal. Judge SHERWOOD speaking for the court said: "We shall, therefore, rule that, where an application based upon any of the causes specified in section 1877 is presented, thereupon it becomes the duty of the *regular judge to order* the election of a special judge" (100 Mo. 93, *loc. cit.*), and he then goes on to show that the order made in March, 1888, being for the election of a special judge simply "to decide defendant's application for a change of venue," was not broad enough, and for that reason was a nullity, and that it ought to have required the election of a special judge "for the trial of the particular cause pending    *    *    * *and* to decide defendant's application for a change of venue," and then reversed and *remanded* the case. If nothing could be done with it by anybody why remand it? It had just as well remain *in limbo*, among the files of this court as the trial court. The clerk of said criminal court had no power to hold an election under the order of March, 1888, because the order was not broad enough, and no second election could have validated that which he had no power to do at all. We, therefore, hold that the clerk had no authority to act, but that Judge WOODSON had jurisdiction to make the order in proper form in December, 1889, for the election of a special judge for the trial of this cause, and to decide the application for a change of venue. Indeed, he proceeded to do, and did do, exactly what this court held he had power to do, and ought to have done, in March, 1888.

Having reached this conclusion, this disposes of the objections made that Judge GRUBB had no jurisdiction to order the change of venue to Andrew county, and that the circuit court of Andrew county acquired no jurisdiction to try the case.

II. Defendant's second contention is that he was not brought to trial before the end of the third term of the court after the indictment was found, and the delay not being for any fault of his or for want of time to try the case, he was and is entitled to his discharge under sections 4222 and 4225, Revised Statutes, 1889. This contention is based upon the theory that as Judge WINN was held by this court to be no judge, and the trial of the case before him *coram non judice* and void, there was *no trial* of the case at all within the meaning of section 4222, *supra;* at least not till the last trial in May, 1890.

We do not think there is any merit in this point. The word "trial," as used in section 4222, *supra,* does not mean a *legal* trial in all respects. No such significance can be attached to it with any show of reason. The defendant was indicted in March, 1888, and was tried before Judge WINN in the following April. He appealed, and before the case was reversed, remanded and reached the Buchanan criminal court, five terms of that court had elapsed. During the time the case was pending in this court, it was not called for trial, nor can we presume that it was even on the docket. At all events, the record before us shows no entries or orders after the appeal was taken in May, 1888, till the case was remanded. The record is silent as to this case from May 29, 1888, till the third day of December, 1889.

The terms of the court during the pendency of an appeal were never intended to be computed under section 4222, *supra,* no matter what the character of the error might be, that was presented by the record. There was a trial *de facto* in this case, and that is all the statute requires.

It is insisted the court below erred in the instructions given and in failing to give others. To determine this question properly we will refer to the salient facts in the case, and the defense interposed by the defendant.

Defendant and deceased, Flora Bulling, were husband and wife, and resided in St. Joseph, Missouri. They were both young, had been married about four years, and had one child, a boy. The deceased had separated from her husband two or three times, and she finally left him in January, 1887, and ever after refused to return to or live with him. The defendant at the time of the homicide, and for some time prior thereto, lived with his father, and had the child with him there. His wife worked at several hotels in St. Joseph, and had been engaged as a diningroom girl in the Herbert House in that city, for some time prior to, and was so engaged at the time of, her death. Defendant did not learn till a short time before the homicide that his wife was at the Herbert House. He went to her mother, Mrs. Brown, and inquired where his wife was. Mrs. Brown refused to tell, and informed defendant that it was his wife's wish that he should not know where she was. He said to Mrs. Brown that he had a job and wanted to take his wife back to live with him, he could do a better part by her. Mrs. Brown persisted, however, in not informing him. But he discovered where she was very soon after this, and then visited her many times at the Herbert House, always asking permission to see her, and whenever they met they seemed to be friendly. He seemed to love his wife dearly, and never lost an opportunity to beg her to return to him.

The defendant gives in his testimony this graphic description of their final interview prior to her death, the interview occurring on Friday or Saturday, and her death on Sunday:

"*Q.* State what occurred at that interview, if you remember. Tell all that occurred now the last time you saw her before the shooting. *A.* Well, the last time I saw her, I went to her and I told her; I says: 'Flory, you have been here long enough now; can't you please come home?' She says: 'No; I have told you that I

The State v. Bulling.

ain't going to come home; I wish you wouldn't bother me any more.' And I says: 'If you won't come home on my account, won't you please come home on the child's account? The boy is sick, not well, and won't you please come home on the child's account?' She says: 'No; the child is well taken care of;' she wa'n't going to look after it; she was too young to be a mother; that my mother would take good care of the child; and I says to her: 'Flory, you are running around to these balls, and going to rooms with men;' and I says: 'Won't you please promise me, if you won't come back, that you will lead a respectable life, and live as a virtuous woman ought to live?' and she says: 'No; I'll promise you nothing;' and then I asked her: 'Flory, won't you kiss me good bye?' and she said: 'No; I won't kiss you or do anything else,' and slammed the door in my face. She says: 'God damn you, go!' She says: 'I am done with you; stay away from here.'"

It seems that on Saturday night preceding the fatal Sunday she went to a masquerade ball, and wore a dress low in the neck and very short in the skirt. Defendant's brother saw her at that ball, and about a half hour before the fatal shot was fired he told defendant about his wife's attendance at this ball, and how she was dressed. Soon after he got this information, which was imparted to him in a saloon some distance from the Herbert House, on the twenty-ninth day of January, 1888, about half past one or two o'clock P. M.; he took a drink of whiskey, left the saloon, and was met in the street by Ed. Meyers, his friend. Meyers said to him: "Halloo! where are you going?" and he replied, "I thought I would go up to the house a little while."

Mr. N. Talbott, who was clerk in the Herbert House, in speaking of defendant's visit to his wife, especially at the time of the killing, testified as follows: "*Q.* What would he say, if anything, when he came? *A.* He would always ask me the privilege of going in and

visiting his wife, and I generally went in and found out whether she would see him or not, and if she said yes, then I would admit Mr. Bulling, and they always seemed as friends.

"*Q.* Well, on the twenty-eighth or twenty-ninth day of January, 1888, state whether or not he called there? *A.* Yes, sir; he came in and I was in the office.

"*Q.* Well, what did he do when he came? *A.* He didn't ask me the privilege of going through, or anything of the kind, and he went through himself, and, the office stands just about—the office door, from the office door to the diningroom door, stands about, I should judge, about three feet—just a hallway between. I don't know the regular measurement of it, and he came in and I seen him go through. Well, she had told me before that, that if he came again not to admit him, and this time when he started through, I was just behind the office, and I seen him go through, and after he had gone, of course, he got ahead of me, I dropped my business behind the office, and went in, and I heard him say to her—he made this remark to her—he says, says he: ' I want to get, Flora, those things out of my trunk.'

"*Q.* Out of my trunk? *A.* Yes or no; not his trunk, her trunk, I mean, excuse me. And she says, ' Yes, you have got some papers in there,' and she says, ' I want you to take them.' Well, they both started back quietly.

"*Q.* Did she tell him he had any other things in her trunk? *A.* Yes, I will state that in a minute, just the way the statement was; and he says, ' Yes, I have got a watch in there and some checks.' She says, ' Yes, you have got an old watch in there and a few checks.'

"*Q.* What sort of checks? *A.* Those poker checks; and she says, ' I will give them to you.' Well, they both went back peaceably together, and, of course, I went back in the office, and about two minutes afterwards, it was not more than two minutes afterwards, I

The State v. Bulling.

guess, the girls came screaming to me and hallooed 'murder.'

"*Q.* What girls? *A.* Our diningroom girls that were employed in the house—and says, 'He has killed her; he has killed her!' Well, then, I started—of course I knew who they meant by 'he' because there was no body in there but Lou. I goes in and I meets him right in the hallway, and I got hold of him ; Lou says, 'Kill me; shoot me.' He says, 'Poison me ; I have killed her.' Says I, 'Killed who?' I knew who he had killed, of course, but the deed was done away back."

Hattie Brown, sister of the deceased, testified in regard to what occurred at the time of the shooting as follows : "*Q.* Well, now, go on and tell the jury all you saw him do and heard him do, and all you saw. *A.* The first I saw—

"*Q.* Towards your sister. *A.* He was coming through the diningroom door. My sister went to meet him, and they met in the diningroom door that led into the hall. They walked down the hall together, then to the bedroom, and my sister stepped into the bedroom door and Lou put his hand on her back (indicating), kind of pushed her into the room, I should say ; then he put his hand behind him and shut the door, but it didn't latch. A few minutes after that I heard her halloo, 'Oh, Lou, murder ! murder !' and I heard two shots. I ran to the room, and he fired one shot after I got in the room.

"*Q.* How did he hold the revolver? *A.* He held the revolver up somewhere this way (indicating by holding her hand up by the side of her head.)

"*Q.* Where did that bullet go? *A.* In the ceiling.

"*Q.* Where was your sister at that time? *A.* She was on the floor.

"*Q.* Did you see her bleeding any? *A.* Yes, sir.

"*Q.* Whereabouts? *A.* Her head.

"*Q.* Could she talk ? *A.* No sir.

" *Q.* What did he do then ? *A.* I ran in the room after I heard the shots, and he came on out of the room behind me. I went out into the hall and started into the dining room, and got about middleways and turned around and came back, and I don't know where he went to.

" *Q.* What condition was the room in when you went in, as to her trunk, or was her trunk in there ? *A.* Yes, sir.

" *Q.* Did you see her trunk at that time ? *A.* I don't remember where her trunk was, or what condition it was in."

Others testified that defendant said he shot his wife because she was untrue to him, and tried to get away from those who arrested him, they not being officers. It was also proven that defendant had taken several drinks of whiskey the day of the homicide.

Defendant testified that he had no recollection of shooting his wife and had only a very faint recollection of anything that occurred that day. He said he did not know where he got the pistol, nor that he even had one, and that he did not intend to kill his wife, or do her any harm. The testimony further showed that deceased was shot in the back of the head ; that she must have died almost instantly ; that she fell on the floor with her feet towards the trunk, which was open. Defendant interposed the plea of insanity.

The court instructed the jury on murder of the first degree, manslaughter of the fourth degree and the defense of insanity, and refused an instruction asked by defendant on manslaughter of the third degree. While defendant's counsel interposed general objections to all the instructions given by the court, they did not urge specific objections to any, except the third, given at the instance of the state. They objected also in a specific manner to the court refusing the instructions they asked on the subject of manslaughter of the third degree, and

to the failure of the court to instruct on murder of the second degree. We will notice these objections in their order.

III. Instruction, numbered 3, given at the instance of the state is as follows : "3. The court instructs the jury that if they believe from the evidence in this case that the defendant shot and killed Flora Bulling, his wife, because he was jealous of her, or because she was untrue to him, or because he believed her to be untrue to him, or because she left him and refused to live with him, or either, then the jury will find the defendant guilty of murder in the first degree as defined in instruction, numbered 1, given on the part of the state, or acquit the defendant on the ground of insanity."

It is argued that this instruction left out all the elements of murder of the first degree, deliberation, premeditation, wilfulness and malice aforethought, and for that reason was erroneous, and ought not to have been given, and that this error was not cured by a previous instruction properly defining murder of the first degree. While we do not approve of the phraseology of the instruction quoted, we hold that the error in giving it, if there was error, was harmless in this case. The doctrine of this instruction seems to have received the approval of this court in *State v. Anderson*, 98 Mo. 461. And upon this point we will simply repeat what Judge SHERWOOD said in the *Patterson case*, 73 Mo. 695: "So far as concerns the instructions, it suffices to say that the first, in behalf of the state, correctly defines the offense of which the defendant was convicted ; and it is impossible, that the others likewise given for the state, though incorrect, could have operated prejudicially to the defendant." *State v. Hopper*, 71 Mo. 425 ; *State v. Talbott*, 73 Mo. 347 ; *State v. Ellis*, 74 Mo. 207 ; *State v. McGinnis*, 76 Mo. 326 ; *State v. Snell*, 78 Mo. 240 ; *State v. Nelson*, 88 Mo. 126 ; *State v. Anderson*, 89 Mo. 312.

The reasons why we regard this instruction harmless in this case will more fully appear when we come to consider the failure of the court to give instructions for murder of the second degree and manslaughter of the third degree, which we will now proceed to do.

IV.    We hold that the court did right in refusing the instruction asked by defendant in regard to manslaughter of the third degree, and committed error in failing to instruct on the subject of murder of the second degree.    It is true the court instructed the jury that they might find defendant guilty of manslaughter of the fourth degree if they found he accidentally killed his wife.    This instruction ought not to have been given simply because there was no evidence to support it, but, as it was for defendant's benefit, it cannot be urged as reversible error.    The court ought to have confined the jury by its instructions to murder of the first degree and the defense of insanity.

Defendant's counsel, it is true, urged in their oral argument before this court with great earnestness, and we might say with vehemence, that defendant could not have acted and did not act *deliberately* in the killing of his wife, as that term is defined by the courts in Missouri, and as it was defined in this case, that he did not commit the act in a cool state of the blood, but in a heat of passion.    The contention is that when the defendant had begged his wife to return to him, and she refused; when he asked her to return for the sake of the child, and she refused; when he asked her to promise him to lead a virtuous life, and she refused to make the promise; and when his brother informed him she had been to a disreputable ball the night before, dressed in an immodest manner, he would have been more or less than human if he could have been in a cool state of the blood, and not in a heat of passion.    We do not deny that he may have been excited by passion, and in a sense not in a cool state of the blood.    The only question is, whether there was any cause for his excited state

of mind in this case that the law can recognize. The line must be drawn somewhere, and we think that line has been definitely and accurately marked out and defined by the law, so there is no excuse in not finding it.

At common law there were no degrees of murder, but our statute divided those homicides which were murder at common law into two degrees. The distinction between these degrees of murder is clear and well defined in this state. A heat of passion at common law meant a heated state of the blood, caused by a *lawful* provocation, and when a man suddenly killed another under the influence of such a passion, thus produced, he was not guilty of murder, but of manslaughter. In drawing the distinction between the two degrees of murder this court has divided passion or excitement of mind, which mitigates a homicidal act, into two phases or degrees. One phase of this passion reduces the act to murder of the second degree, and the other to manslaughter. When our statute uses the words " heat of passion" in the definition of the various degrees of manslaughter, it evidently intends to use them in their common-law sense, that is, such " heat of passion," as is produced by a lawful provocation. The definition of that " heat of passion," which reduces a homicide to murder of the second degree, is the outgrowth of the line of decisions of this court in construing the section of the statute in regard to that grade of homicide.

The two phases or degrees of passion under our decisions referred to are :   *First.* That passion which is produced by a *just* provocation, and, *second*, that passion which is produced by a *lawful* provocation. Opprobrious epithets, insulting gestures and the like are held to constitute just provocation in this state, and, where the passion or excitement of mind is produced by such provocation to the extent that it materially interferes with the judgment and reason, an act done *at once*, under its immediate influence, cannot in law be

said to be done deliberately, and the actor cannot in law be said to be in a cool state of the blood.   A homicide, committed under the influence of such passion, is not murder of the first, but murder of the second, degree under our criminal code.   This passion, thus produced, is a statutory concession to the frailty of human nature: but before it can operate to mitigate a homicide from murder of the first, to murder of the second, degree the party acting under its influence must act *suddenly* and before he has time to reflect.

Without attempting to give a definition of just provocation that will be of universal application, we can say that the evidence most unequivocally shows that there was no just provocation in this case to create in defendant's mind that passion which can be recognized by the law as any justification whatever for the shooting of deceased.   He learned of his wife's attendance at the masquerade ball, and the style of her dress, about a half hour before he shot her.   He walked several blocks after this information was imparted to him, walked into the Herbert House, passed the clerk without asking permission to go in, as he had formerly done, went to the diningroom door where he met his wife in a friendly manner, asked her for his watch and checks, which were in her trunk.   She proceeded with him very readily to get them for him, and, when they entered her room, he, in a very short time, shot her in the back of the head, and killed her instantly.   Her trunk was found open, and she was lying on the floor, her feet towards the trunk.   He walked out of the room and told everybody whom he met, that he had killed his wife.   These facts are proved beyond controversy or doubt.   The defendant does not controvert them.   He simply says, he remembers nothing about the occurrence at all.

We are now asked to declare the law to be that the fact that defendant requested his wife to return to him, which she refused to do ; that he requested her to kiss

him, which she refused to do; that he believed her unfaithful to her marital vows; and that a half hour before he shot her he was informed by his brother that she had been to a disreputable ball the night before, dressed immodestly, and conducting herself in an improper manner, constituted a just cause of provocation, and even a lawful provocation, which would relieve him of the crime of murder of either degree. Such doctrine applied in such a case as this would overturn all precedent, and would authorize a party that was injured, or that supposed he was injured, to take the law into his own hands and inflict such punishment as he deemed adequate to the injury, not even stopping short of death. If he was acting under excitement and passion, it was such excitement and passion, as the law cannot recognize without making every man his own avenger, and authorizing men and women to right their own wrongs. This would be a monstrous doctrine to announce in society governed by law.

We were asked in the argument, if the wife had called her husband a liar or thief, and he had shot her, if he would not have been guilty of murder of the second degree only, and why not apply the same doctrine to the facts of this case, and hold that defendant had just cause of provocation for his excitement of mind or passion which would mitigate his act? We reply that if she had called him a liar, and he had walked several blocks and waited a half hour and then shot her, he would have been guilty of murder of the first degree. After a man is insulted he cannot wait a half hour, walk several blocks and set up as a mitigating fact that his passion had been aroused by an insulting epithet, and his blood was still up. But in this case his wife had applied to him no insulting epithets. She had attended a disreputable ball the night before; he was informed of this, and he then walked several blocks, and, a half hour after he got this information, he shot and instantly killed her. If she had been present when he

got this information, and he had suddenly shot her down, the law would not have excused him in any degree, and *a fortiori* would he not be excused for firing the deadly shot a half hour afterwards?

Nor can he set up as an excuse for his excitement or passion, if he had any, the fact that he had, at least twenty-four hours before, asked her to return to him, which she refused to do ; that he asked her to promise him to lead a reputable life, which promise she refused to make ; and that he asked her to kiss him, which she refused, at the same time slamming the door in his face. To claim that he shot her for her conduct towards him on the Friday or Saturday before the homicide simply adds force to the position that he acted deliberately. He evidently intended to avenge his own supposed wrongs after he had ample time to deliberate about it. This was a cold-blooded murder, or defendant was insane at the time and, therefore, guilty of no offense. And, having come to this conclusion, we, of course, hold that instruction, numbered 3, quoted in this opinion, could not have injured defendant; for, if he killed his wife for the reasons set out in that instruction ( and no other reasons can be conceived for this act), then he was guilty of murder of the first degree under the facts of this case, unless he was excused on the ground of insanity. We will add that this conclusion on this part of the case is based solely upon the case made by defendant and the other witnesses. And, in justice to the deceased, we will say that, her lips being sealed by death, her version of her conduct towards her husband, and her conduct generally, and his conduct towards her, is, of course, not before us. What that version would have been, we do not know, nor are we authorized to conjecture. All we have to say is that defendant had no right to kill her for any or all of the reasons alleged in his behalf, nor did these reasons mitigate or tend to mitigate the offense. The jury having found that he was sane at the time he committed the homicide, they could not have done

otherwise, without stultifying themselves, than find him guilty of murder of the first degree.

It is claimed that, as he swore he did not intend to kill his wife, or to injure her, and did not remember shooting her, the court ought to have given an instruction for involuntary manslaughter under section 3471, Revised Statutes, 1889. The court committed no error in refusing to so instruct. If he was sane he must have intended to kill, and, as applicable to this case, we will repeat what was said by this court in the case of *State v. Bryant*, 102 Mo. 24: " So here the physical facts in the case are equally plain, and we shall not stultify ourselves by believing the defendant's words in preference to his acts. The latter are the true exponents of his intention, and they furnish the only safe key to his motive."

This instruction was rightly refused on another ground. It proposed to submit to the jury the question of an involuntary homicide, committed in a heat of passion. The heat of passion referred to in section 3471, *supra*, is that heat of passion which is produced by a lawful provocation as that term was understood at common law. This court has held that "legal," "lawful," "adequate" and "reasonable," when used as adjectives qualifying "provocation," are synonyms, and, as a general rule, with very few exceptions, it takes an assault or personal violence to constitute this provocation. Suffice it to say there was *no evidence* in this case which proved, or tended to prove, any lawful provocation. Hence, no instruction ought to have been given predicated on an involuntary killing in a heat of passion.

V. As to the defense of insanity we have to say that it was fairly submitted to the jury on the evidence, by instructions which have been held by this court to be exceptionally clear and full on that defense in the case of the *State v. Pagels*, 92 Mo. 300, the instructions in

VOL. 105—15

this case being literal copies, *mutatis mutandis*, of those given in that case.

There was no error committed by the court in admitting or rejecting testimony, either on this question or any other. Indeed, the rulings of the court were very favorable to the defendant. The question of his sanity has been submitted to two juries, and there have been two verdicts against him on that issue, and we think the testimony in the case fully justified this finding.

VI. The defendant set out in his motion for new trial, and has urged here, that the trial judge interrupted his counsel in his arguments to the jury to his prejudice. This objection appears nowhere except in the motion for new trial, and it has been held by this court that the motion for new trial alone does not prove any fact not shown by the record, and that question is no longer open for discussion. *State v. McDaniel*, 94 Mo. 301. If defendant had desired to present a prejudicial interruption of his attorney's argument by the court, the way for him to have done it would have been to have the judge insert in the *bill of exceptions* what the argument was and what the judge said in interrupting it, and the exceptions taken. This not having been done, we cannot say that the judge improperly interfered in the argument. Judgment affirmed. All concur.