STATE v. E. C. HARMAN.

*Indictment--Murder--Manslaughter--Excusable Homicide.*

1. On a trial for murder, if it appear that the prisoner saw the deceased in his (prisoner's) house with his arms around the neck of prisoner's wife and thereupon entered the house, when the deceased came at him with a knife and the prisoner killed him, it is manslaughter.

2. If A on entering his own house is assailed by another with a knife and thereupon enters into a fight with him, standing not entirely on the defensive, and kills him, it is at the most manslaughter.

3. If in such case, A stands upon the defensive and does not fight until he is attacked and threatened with death or great bodily harm, when to save himself he kills his assailant, it is excusable homicide, even if A does not turn and flee out of the house.

(*State* v. *Samuel*, 3 Jones 74; *State* v. *John*, 8 Ire. 330, cited and approved.)

INDICTMENT for Murder tried at Fall Term, 1877, of WATAUGA Superior Court, before *Cloud, J.*

The prisoner was charged with the murder of Elisha Trivett, and the statement of the case sent to this Court is substantially as follows:

Eveline Trivett, wife of deceased, testified, that on Sunday the 24th of June, 1877, her husband started from home saying he was going to one Tice Harman's to sell his cattle.

She and her children walked with him a part of the way.
The road from the deceased to said Harman's leads in about
100 yards of the prisoner's house. Two paths lead from
the prisoner's house to this road,—one in the direction of
said Harman's, and the other in the direction of the deceas-
ed. The body of deceased was found about 20 steps from
the point where the path entered the road towards ·Tice
Harman's. Shortly after deceased left, she heard the pris-
oner's wife (her sister-in-law) calling some one, and scream-
ing, and then it was she heard the crack of a rifle. She went
down the road soon afterwards, about 300 yards, and found
the body of her husband, lying on his back, with hat over
his eyes, and a bullet hole in his breast. His left hand was
cut in several places. His pocket knife was open in his
right hand. There were some logs and bushes by the side
of the road, behind which were signs of tracks &c. The
prisoner had threatened to kill deceased if he did not keep
away from his house during his absence. It was also in
evidence that about 12 o'clock the prisoner came running
to the house of Frank Triplett and stated that Elisha Triv-
ett was lying dead in the road opposite his house, and that
he did not know who killed him. There was much circum-
stantial evidence tending to show that the prisoner shot the
deceased from behind the logs &c.

Benjamin Greer, a Justice of the Peace, testified that he
issued a warrant for the arrest of the prisoner in order that
an examination of the circumstances attending the alleged
homicide might be had ; about a week thereafter and in
consequence of a message received from one Farthing, he
went to the house of the latter, where he found the prisoner,
and said to him, "I suppose you admit that you killed
Trivett." The prisoner replied, "Yes I do." The pris-
oner's counsel objected to this question and answer. Objec-
tion overruled.

The State then introduced Farthing who testified that

the prisoner came to his house and said he had killed Trivett in his (prisoner's) house, and said further; "I came up and looked through a crack of the house, saw Trivett with his arm around my wife's neck in the house; saw enough to satisfy me; nobody knows what I had to bear; I ran around to the door, I hardly know how I got there; I would not have shot him if he had not come at me with a knife." This witness further testified that the above confession was voluntary. The prisoner then offered to put in evidence his confessions made to one Church the day after the homicide, and other confessions made to the Justice who committed him to jail, to show that he had made substantially the same statement as was testified to by the witness, Farthing; and also offered to prove that a general state of adultery existed for several years, and up to the time of the homicide, between his wife and the deceased, but both were excluded upon objection by the State.

The prisoner's counsel in his argument to the jury asked His Honor to charge; (1) "That if Harman caught Trivett in his house engaged in adultery with his wife and on that account immediately killed him, it would be manslaughter; (2) That if he caught Trivett in his house with his arms around Mrs. Harman, and immediately slew him by reason of the *furor brevis* caused by the suspicion of adultery, and if the suspicion was reasonable, of which the jury were to judge, it would be manslaughter." These instructions were given."

The counsel then asked for the following instruction:— "That if there was a mutual combat between the parties, each fighting on equal terms, each having a knife, and the prisoner slew the deceased, it would be manslaughter,—to which His Honor did not respond."

The counsel also asked the Court to charge,—"That if deceased made an assault upon the prisoner with his knife, and it was so sudden and violent that the prisoner could not retreat

without manifest danger of death or great bodily harm, and the prisoner slew him for this cause, it would be homicide excusable for self defence, "—to which His Honor replied, "that the prisoner could not be excused unless he retreated to the wall, even if deceased assaulted him with a deadly weapon in his own house."

The counsel also asked the following :—" That if prisoner found deceased in his own house engaged in an act of adultery with his wife, the prisoner was not bound to flee or retreat to the wall, and if he slew deceased under these circumstances to save himself from death or great bodily harm, it would be excusable homicide,—which His Honor declined to give;" but among other things told the jury, " that if he killed him from behind the logs, in the road, as contended by the Solicitor, it was murder. If he watched him going towards his home, and came to the house with malice and killed him, it was murder; but if finding him in his house under reasonable suspicion of adultery, he killed him out of the *furor brevis* excited thereby, it would be manslaughter·" Verdict, Guilty of Murder. Judgment. Appeal by prisoner.

*Attorney General,* for the State.
*Messrs Folk* & *Armfield,* for the prisoner.

READE, J.  1.  " Should he deal with our sister as with an harlot?" is the voice of unrestrained human nature, since Shechem defiled the daughter of Jacob and was slain by her brothers.  Gen. ch. 34.

We have restrained human nature in so far as we say, you shall not slay in redress of a past wrong, but if you slay the wrong doer in the *very act,* it will not be murder, but manslaughter. The redress for past offences must be sought through the process of the Courts.

In the case before us, the prisoner looked through a crack of his house, and saw the deceased, whom he had before sus-

pected, with his arms around his wife's neck and saw enough to satisfy him, and ran around to the door and into his house, when the deceased came at him with a knife, and he killed him. The situation was not the *very act*, but it was severely proximate, and fine distinctions need not be made. This is clearly not murder, but manslaughter. *State* v. *Samuel*, 3 Jones 74; *State* v. *John*, 8 Ire. 330.

2. Leave adultery out of the question, then we have this case: The deceased was in the prisoner's house in a hostile attitude and upon the prisoner's entering, came at him with a knife, a deadly weapon, and the prisoner, from the necessity to save himself, killed him.

If upon the prisoner's entering his house and being assailed by the deceased with a knife, he entered into a fight with the deceased and stood not entirely on the defensive, and in the fight slew the deceased, it would be manslaughter at the most. But if the prisoner stood entirely on the defensive and would not have fought but for the attack, and the attack threatened death or great bodily harm, and he killed to save himself, then it was excusable homicide, although the prisoner did not turn and flee out of his house. For, being in his own house, he was not obliged to flee, but had the right to repel force with force, and to increase his force, so as not only to resist, but to overcome the assault.

In not giving the prisoner the benefit of these principles, His Honor erred.

We have assumed the facts to be as stated above, not because they were the facts, but because the State offered in evidence the declarations of the prisoner, and he stated the facts to be as we have stated them. And the prisoner had the right to have the law declared upon the hypothesis that the facts were as he had stated them. What the facts really were, was a question for the jury.

There is error. This will be certified.

PER CURIAM.                        *Venire de novo.*