# Gafford *v.* The State.

## *Indictment for Murder.*

1. *Homicide; self-defense; admissibility of evidence of adulterous relations between deceased and defendant's sister.*—On a trial under an indictment for murder, where the defendant claims that he acted in self-defense, and the testimony is in conflict as to who was the aggressor in the fatal rencounter, and there is testimony that the deceased had made threats against the defendant's life, which were communicated to him, evidence of the existence of adulterous relations between the deceased and the defendant's sister, is admissible as tending to show a motive for deceased being the aggressor in the fatal difficulty, and as tending to show a reasonableness for defendant's apprehension of danger of death or serious bodily harm from the attack made upon him by deceased, if the jury should believe that the deceased was the aggressor. (*Haralson* and *Tyson, JJ., dissenting*).

2. *Same; same.*—If on a trial under an indictment for murder, it is shown that the defendant arms himself with a deadly weapon and goes to a place on the public road where the deceased was

[Gafford v. The State.]

expected to pass, with the design of killing him to avenge wrongs done by the deceased to the defendant's family, or to wreak vengeance upon him because of threats made by the deceased, the defendant can not invoke self-defense, even though the deceased was the aggressor in the fatal difficulty, if the defendant at the time of the killing had not abandoned such previously formed design.

3. *Same; same; charge to the jury.*—On a trial under an indictment for murder, a charge which instructs the jury that if at the time of the killing the deceased "was attacking or in the act of attacking the defendant with a deadly weapon, then the defendant was not bound to retreat, but had the right to stand and defend himself, provided he was without fault in bringing on the difficulty which resulted in the killing," was properly refused, in that it assumes that the defendant could not have retreated without having endangered his safety, which was a question for the jury to determine.

4. *Same; same; same.*—On a trial in a criminal case, a charge which instructs the jury that they can not convict the defendant "Unless the evidence against the defendant should be such as to exclude to a moral certainty every hypothesis or supposition but that of his guilt of the offense imputed to him," exacts too high a measure of proof and is properly refused.

5. *Same; same.*—On a trial under an indictment for murder, where the evidence shows that the deceased was shot by the defendant with a shot gun on a public road, and there is no question raised as to the defendant's right to carry a shot gun, a charge which instructs the jury "that if the defendant had reason to apprehend an attack, he had a legal right to bear arms in defense of himself," is abstract and properly refused.

APPEAL from the Circuit Court of Butler.

Tried before the Hon. JOHN R. TYSON.

The appellant, John A. Gafford, was indicted and tried for the murder of Francis Bartow Lloyd, was convicted of murder in the first degree, and sentenced to be hung. The material facts of the case, necessary to an understanding of the decision on the present appeal, are sufficiently stated in the opinion.

Upon the introduction of all the evidence, the defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked: (1.) "The court

charges the jury that if they believe from the evidence in this case beyond all reasonable doubt that deceased, at the time of the killing, was attacking or in the act of attacking the defendant with a deadly weapon, then the defendant was not bound to retreat, but had the right to stand and defend himself, provided he was without fault in bringing on the difficulty which resulted in the killing." (2.) "The court charges the jury that unless the evidence against the defendant should be such as to exclude to a moral certainty every hypothesis or supposition but that of his guilt of the offense imputed to him, the jury must not convict the defendant." (3.) "The court charges the jury, that if the defendant had reason to apprehend an attack he had a legal right to bear arms in defense of himself."

JAMES WEATHERLY and TERRY RICHARDSON, for appellant.—There was evidence at least tending to show that the killing was in self defense; or, in other words, to prove that Lloyd was himself the aggressor, and that the circumstances were such as to induce in Gafford's mind a reasonable apprehension that his own life was in imminent peril, and to render an attempt to retreat unavailing. Hence every element composing the defense interposed was in controversy before the jury, whose sole province it was to pass upon the sufficiency, the weight and the credibility of the evidence.—*Amos v. State,* 73 Ala. 498, 502, and cases cited. It was not for the Court to hold, as matter of law, that any relevant evidence should be excluded because of the Court's disbelief that it would add weight, or lend credence or support to any evidence already legally submitted to the jury. It then being doubtful who began the attack, Gafford or Lloyd, evidence was offered which it was contended by the defendant tended to show that Lloyd was inspired by an evil motive to kill Gafford and to supply the *quo animo* of Lloyd's threat against Gafford's life, namely, evidence to the effect that Gafford's sister, Mrs. Miller, was Lloyd's mistress or paramour. This was sought to be proved by Lloyd's own admissions, by evidence of specific acts of adultery, and by other evidence of habitual adul-

terous intercourse. When the jury were brought to consider the question of the credibility of the defensive testimony that Lloyd had first attempted to kill Gafford, doubtless the questions occurred to their minds, "How did Lloyd feel towards Gafford; did he fear him; did he hate him; did he have any cause or motive to injure or kill him?" What *cause* of trouble existed in the antecedent relations of these two men which would tend to provoke Lloyd to kill Gafford? These were questions which would naturally occur to the minds of impartial jurors, bent only on doing equal and exact justice between the State and the defendant. And if these were pertinent questions, that is, questions legally involved in the issues presented, then, on the supposition that the illicit relationship between Lloyd and Mrs. Miller were established, would such fact tend to show a motive on Lloyd's part to kill Gafford? The question would not be as to the *sufficiency* or *conclusiveness* of the evidence to show motive, but would it afford *any inference, however slight,* tending to establish such motive, or to explain or corroborate the evidence of Lloyd's threat to kill Gafford? If so, it was competent.—*Roberts v. State,* 68 Ala. 164, 165; 3 Rice on Evidence, p. 580. If the fact of such illicit relationship did have *any tendency,* however slight, to throw light on Lloyd's state of mind toward Gafford at the time of the homicide, and to elucidate any of the elements of doubt involved in the question of self defense, then it would be error for the court to exclude that evidence, no matter with what stigma or stain it was covered; its competency alone was for the court; its credibility was for the jury.—*Wiley v. State,* 99 Ala. 146; *Jordan v. State,* 81 Ala. 20; *Mattison v. State,* 55 Ala. 224.

It is conceded that the admissibility of the evidence is dependent upon there being *some* evidence tending to prove that the deceased made some overt demonstration of an intention to carry his threat, or evil motive, into execution; but there can be no doubt that in this case the necessary predicate for the admission of such testimony exists.—*Wiley v. State,* 99 Ala. 146; *Myers v. State,* 62 Ala. 599, 604; 3 Rice on Evidence, pp. 580-582.

[Gafford v. The State.]

Evidence of this character is competent upon the same principle and under the same circumstances, regulating the admission of evidence of *uncommunicated threats made by deceased*—to prove the *animus* of the deceased, and it is well settled that the *animus* of the deceased towards the defendant is always relevant under a plea of self-defense, when there is evidence tending to show that the deceased was the aggressor in the combat resulting in his death.—*Green v. State,* 69 Ala. 6, 9-10, and cases cited; *Burns v. State,* 49 Ala. 375; 3 Rice on Evidence, p. 594, § 370, citing many cases.

"When the question is as to knowledge, intent, motive, or any bodily or mental state, *evidence of other acts done* showing the existence of such knowledge, intent, motive, or bodily or mental state, are admissible, *even though it involve the proof of other crimes.*"—*McKelvey* on Evidence, p. 146, § 107 and note 21; 3 Rice on Evidence, pp. 446, 447, § 281; *Pate v. State,* 94 Ala. 17, citing *Marler v. State,* 68 Ala. 584; *Johnson v. State,* 17 Ala. 618; *Hall v. State,* 40 Ala. 698; *Russell v. State,* 11 Tex. Court of Appeals, 291-294; *Copeland v. State,* 7 Humphrey 429; s. c. Horr & Thompson Cases Self-Defense 45.

And the remoteness or nearness of time as to threats and declarations pertaining to the act subsequently committed, or as to the facts or circumstances indicating the animus or motive, with which the act was committed, makes no difference upon the question of the *competency of the evidence.* That consideration only affects the *weight* of the evidence.—*Keener v. State,* 18 Ga. 194; *Cribbs v. State,* 86 Ala. 613; *Burns v. State,* 49 Ala. 375; *Pate v. State,* 94 Ala. 17; 3 Rice on Evidence, p. 584; *Gandy v. Humphries,* 35 Ala. 617.

The adulterous love of a man for a woman may be of such a nature as to furnish a motive for the homicide of one who stands in the path of its enjoyment.—*Johnson v. State,* 17 Ala. 625; *Hawes v. State,* 88 Ala. 37; *Johnson v. State,* 94 Ala.35; *Ball v. State,* 29 Tex. Ct. App. 107; Crim. Code of 1896, p. 300.

All acts of the deceased previous to the fatal encounter may be shown for the consideration of the jury, which

[Gafford v. The State.]

form a part of the *res gestae,* or which shed light upon the motive, or bear upon the question of provocation.— *Hall v. State,* 40 Ala. 698; *Duncan v. State,* 88 Ala. 34; *Johnson v. State,* 94 Ala. 35; *McNeill v. State,* 10 Ala. 122; *Johnson v. State,* 17 Ala. 618; *Pate v. State,* 94 Ala. 17; *Marler v. State,* 68 Ala. 584; *Wiley v. State,* 99 Ala. 146.

The 1st charge requested by the defendant should have been given. The 2d charge requested by the defendant should have been given. The 3d charge requested by the defendant should have been given.—*Ex parte Nettles,* 58 Ala 276; 15 S. C. 720.

WILLIAM C. FITTS, Attorney-General, for the State. The evidence tending to show adulterous relations between the deceased and Mrs. Miller, the sister of the defendant, was properly excluded.—*Robinson v. State,* 108 Ala. 15; *State ex rel. v. Tally,* 102 Ala. 34; *Rogers v. State,* 117 Ala. 9; *State v. John,* 8 Ired. (N. C.) 330; Foster's Rep. Crown Law 296; *State v. Samuel,* 3 Jones (N. C.) 74; Bishop's Crim. Law, § 708; *State v. Neville,* 4 Jones (N. C.) 432.

The first charge refused to defendant was properly refused, because it ignores the duty to retreat.—*Goldsmith v. State,* 105 Ala. 8; *Dorsey v. State,* 107 Ala. 157; *Compton v. State,* 110 Ala. 26.

The second charge refused to defendant was properly refused on the following authorities: *Yarbrough v. State,* 105 Ala. 43; *Crawford v. State,* 112 Ala. 4; *Baldwin v. State,* 111 Ala. 12; *Johnson v. State,* 102 Ala. 3.

The last charge refused to the defendant was invasive of the province of the jury and did not assert any proposition applicable to the case in hand.—*Head v. State,* 44 Miss. 741.

SHARPE, J.—The defendant was indicted, tried and convicted on the charge of murder, and sentenced to capital punishment. The material questions reserved for review by this court arise from the rulings of the trial court upon the admissibility of testimony, and the refusal of instructions requested by the defendant. We

have, however, given to the entire record the careful
scrutiny required by the vital importance of the case to
the defendant, and the solemn duty imposed upon us by
law, and, at the same time, impressed, on the one hand,
with the necessity, for the repose and security of society,
of sustaining all legal convictions in cases of this charac-
ter, and, on the other, with our duty to see that the ac-
cused is not deprived of any right necessary or proper to
the full presentation of his defense, and the enjoyment
to the fullest extent authorized by law, of his constitu-
tional right to a full, fair and impartial trial by jury.

There are certain facts bearing upon the homicide that
are undisputed, and as to which there is no conflict in
the testimony, a brief summary of which is necessary to
be given in order to a clear statement of the conclusions
we have reached upon the rulings of the circuit court
upon the testimony. On the morning of Monday, August
25th, 1897, deceased visited Greenville, in Butler county,
Alabama, riding there in his buggy as had been his habit
for some time. On the afternoon of the same day he was
returning in his buggy, alone, from Greenville to his
home. At about 6 o'clock of that afternoon he came upon
defendant, who was on or near the public road with gun
at a point not far from defendant's home. At or near
the time of this meeting two rapid reports of a gun were
heard by several persons who were near the locality, and
immediately thereafter the defendant was seen walking
away with his gun, and upon meeting two other persons
near at hand, told them he had shot deceased, but did not
know whether he was dead, and requesting them to do
what they could for deceased. Deceased was found by
these two parties, and others, lying dead in the road with
gun-shot wounds on his body and a pistol, which was
recognized as belonging to deceased, lying on the ground
about five or six feet away from the body. There were
two eye-witnesses to the homicide besides the defendant
himself, one testifying for the State and the other for the
defendant, and their statements are altogether irrecon-
cilable. The statement of the State's witness makes out
a case of unprovoked, willful, premeditated and deliber-
ate murder by lying in wait with a deadly weapon; while

the defendant's witness makes deceased the aggressor with a deadly weapon, and discloses a shooting in self-defense by the defendant. The testimony of this witness corresponds in all respects with that of defendant himself, except that the latter gives a conversation between him and deceased which his witness stated he (witness) could not hear. The State's witness was contradicted in some collateral statements made by her, and other witnesses testified she had told them she did not see the killing. The defendant's witness was shown to have resided, when the homicide occurred, on defendant's place. Numerous other witnesses were examined both on behalf of the prosecution and the defense, but it is not necessary to refer in detail to their testimony. Among other things their testimony shows threats, both recent and remote, on the part of deceased against defendant's life, and from some of said testimony it might be inferred that the defendant had made like threats against deceased, and that the threats of each were communicated to the other. It is also inferable from unchallenged testimony that these threats grew out of certain rumors connecting the names of defendant's widowed sister and deceased in an unfavorable light. The defendant offered to introduce proof of an adulterous relation between deceased and his sister at the time of and before the homicide, as well as specified acts of adultery on their part, but the court refused to admit the testimony so offered, and to this action of the court the defendant excepted. If the question of self-defense were out of the case it would be quite clear that all testimony of this character would be inadmissible for the purpose of justifying the murder, and would be equally unavailing to reduce the killing from murder to manslaughter, unless the circumstances of such provocation were of such a character as were reasonably calculated to provoke sudden passion and resentment, and the homicide was traceable solely to the influence of passion thus engendered. For example, if the defendant had discovered deceased and his sister in the act of adultery and, under the influence of sudden passion thus aroused, had slain him, then the killing would not have been willful, malicious, deliberate and premedi-

tated, or murder in the first degree, but murder in the second degree, or, according to circumstances, manslaughter in the first degree.—*Ex parte Sloane*, 95 Ala. 22; *Watson v. State*, 82 Ala. 12. It is not necessary, however, to consider the question of the admissibility of this testimony in this aspect, for the reason that it was not and could not have been offered for any such purpose, inasmuch as the defendant in his own testimony negatives the idea that he acted upon any such provocation, and rests his case entirely upon the right of self-defense.

The real question, therefore, is, would the testimony offered to be introduced by defendant have any tendency, even though slight, to shed light on the main inquiry as to self-defense, which was clouded by conflicting and hopelessly irreconcilable testimony? In *Mattison v. State*, 55 Ala. 224, we said: "In inquiries of fact, dependent on circumstantial evidence for their solution, no certain rule can be laid down which will define with unerring accuracy what collateral facts and circumstances are sufficiently proximate to justify their admission in evidence. * * * Whatever tends to shed light on the main inquiry and does not withdraw attention from such main inquiry by obtruding upon the minds of the jury matters which are foreign, or of questionable pertinency is, as a general rule, admissible evidence." In view of the conflicting testimony as to which of the two, deceased or the defendant, was the aggressor in the unfortunate tragedy, would the offered testimony shed any light on that question? Could the jury fairly determine that question without knowledge of facts which might have exerted an influence upon or supplied the motive to one or the other to become the aggressor? Or did the knowledge by the defendant of the facts sought to be proven, reasonably exert any influence upon the mind of defendant in interpreting deceased's threats, motive or conduct? Or, in other words, would knowledge of these facts by defendant authorize him to regard as hostile and dangerous, threats, motive or conduct on deceased's part which, in the absence of that knowledge, might not have justified that conclusion? In *Bell v. State*, 29 Tex.

App. 125, the court upon a much similar question says: "It was important to the defendant that the jury should be fully informed as to the true cause of the enmity entertained by the deceased against him, and the character of that enmity. Such information would enable the jury, in determining the issue of self-defense, to view the acts of the deceased from the defendant's standpoint. Without this information the jury could not know, as the defendant did, the settled, determined, and deadly character of the deceased's hatred towards him, and the true cause of that hatred. This testimony throws light, not only upon the motive actuating the deceased in attacking the defendant, but upon the conduct of the defendant upon that occasion, and the motive which actuated him to kill the deceased. It tends to show that he had reasonable ground to apprehend that the attack made upon him was intended by the deceased to be a deadly one. It gives character to the threats, motive, and conduct of the deceased towards the defendant, and also to the motive and conduct of the defendant;" citing *Russell v. State*, 11 Tex. App. 288. We would not be understood as indicating any opinion that the deceased made an attack upon the defendant, or was in anywise the aggressor, but there was evidence on the part of the defendant to that effect before the jury, which it was fully as much their duty to weigh and consider as the testimony on behalf of the prosecution showing the defendant to have been the aggressor.

In *Rutledge v. State*, 88 Ala. 85, it was said by this court: "We understand the rule in respect to the admission of evidence, on the part of a defendant on trial for murder, of previous threats by, or difficulties with, or ill-feeling on the part of deceased, to be this: that when any phase of the testimony would, if believed, present a case of self-defense, then the accused, using this aspect of the facts adduced as a predicate therefor, may go further, and strengthen it, by showing that the deceased had threatened him, or entertained ill-feeling toward him, or that there had been difficulties between them; * * * or, to state the principle in a more concrete form, the evidence adduced must have some tendency to establish the

constituents of the right to destroy life that life may be preserved. * * * The theory of the rule is, that a right to kill can never be the result of the violent, blood-thirsty disposition, revengeful feeling, or threats of the deceased, and hence, until there are facts offered which go in some measure to establish the necessity to strike, as the law defines that necessity, such evidence is patently irrelevant. These matters, in other words, are competent to give character to a necessity otherwise shown, and no necessity being otherwise shown, there is an utter absence of the predicate upon which alone such qualifying evidence should be received." In *Copeland v. State*, Horrigan & Thompson's Cases of Self-defense, 41, the defendant killed a woman with whom her husband had adulterous relations, and the question was whether such killing was in self-defense. The court on this point says: "But it becomes highly important to investigate with care, first, the effect which this intercourse, notorious as it was, produced upon the feelings and vindictive passions of the prisoner and the deceased towards one another, and, second, the mode and manner in which these feelings and passions were brought to bear, in producing the catastrophe so much deplored." And in *Green v. State*, 69 Ala. 9, this court said: "There being ground for argument, at least, that the deceased must have taken some action in the matter of drawing his pistol before the accused fired, this lets in the threat the witness testified the deceased made * * * shortly before the *rencontre*. If believed it tended to show the *animus* of the deceased towards the accused so recently before the homicide as to authorize its consideration by the jury in ascertaining the conduct of the parties immediately before the firing."

We cannot avoid the conclusion, in the light of the foregoing authorities, and that portion of the evidence tending to show that deceased was the aggressor, with a deadly weapon, that the exclusion of the testimony offered by defendant as to deceased's relations with defendant's sister, deprived the jury of proof which, if admitted, might in their opinion have shed light upon the main inquiry in the case, and as to which the testimony before them was so hopelessly conflicting.

It was proved, without contradiction, that defendant
and deceased went on Saturday before the Monday of the
killing, in the presence of deceased's father, that a satis-
factory interview was had between them as to the ru-
mors affecting deceased and defendant's sister, and that
the two parted with repeated friendly shaking of hands.
Notwithstanding this, it is further shown, without con-
flict, that on the morning of the day of the killing de-
ceased sent a hostile and deadly message to defendant,
and the two met in the public road in the afternoon of
that day, both armed with deadly weapons.  Under these
circumstances, and in the absence of the offered testi-
mony, and with deceased's denial of his unlawful rela-
tions with defendant's sister before the jury, the jury
would naturally look in vain for any motive that might
have impelled the deceased to become the aggressor un-
der such circumstances, and might have reasonably in-
ferred that his pistol was drawn, if drawn at all, for de-
fensive purposes against the defendant, who is shown to
have had, at the time, a double barrel shot-gun in his
hands.  With no facts before them to illustrate the char-
acter of deceased's threats of that day, or furnishing an
inference for a motive on his part to attack defendant,
the jury could not, under such circumstances, have
reached any other conclusion than that they did reach,
viz., that the defendant was the aggressor.  But if it had
been shown to them that notwithstanding deceased's de-
nials to defendant of improper relations between de-
ceased and defendant's sister, that such relations in fact
existed then, and had existed for a considerable length of
time previously, it may well be that the jury from their
knowledge of human nature and the history of like cases,
might, in the light of such testimony, have inferred a
motive on deceased's part to remove a dangerous obstacle
out of the way of his illicit enjoyment.  However that
may be, such testimony would have shown the cause of
the enmity of the deceased towards the defendant, its in-
tensity, and would have tended to show a reasonableness
of defendant's apprehension of danger of death or seri-
ous bodily harm from the attack made upon him by de-
ceased, if the jury should believe that such an attack was

made. We are at all events persuaded that with the testimony referred to before them, the jury would have been enabled to balance more justly the substantial merits of the question of self-defense by reason of a fuller and juster apprehension of the defendant's real position at the critical moment of the fatal encounter, and the real state of feeling then existing on the part of each. It is proper, however, for us to observe, that with this testimony in, it would, nevertheless, still be the duty of the jury to inquire whether or not, in view of the provocation, and the state of feeling between the parties, and other attending circumstances, the words or conduct of deceased at the time of the *rencontre* were seized upon by defendant as a pretext to execute a previously formed design to take the life of deceased. While the defendant had the right to carry his gun, and, also, had the right to be upon the public road at the time and place where he and deceased came together, yet, if he went to such place at such time, and with his gun, with the formed design of taking the life of deceased to avenge the wrongs done his sister and family, or to wreak vengeance upon the deceased because of the latter's threats of that day, or previously, then the defendant was not free from fault, and cannot invoke self-defense, even if the jury should believe that deceased had drawn his pistol upon defendant before the latter fired and killed deceased, if the defendant at the time of the killing had not abandoned but still entertained such previously formed design. Our conclusion upon the question of the admissibility of the testimony offered by the defendant to show an adulterous relation between the deceased and defendant's sister, and defendant's knowledge thereof, is, that the circuit court erred in excluding it, and that its exclusion is reversible error.

We think there was no error in the refusal of the court to give the charge numbered 1 requested by the defendant. In the case of *Springfield v. State*, 96 Ala. 81, we said: "Charge No. 14 assumes as matter of law that on the facts therein postulated the defendant could not have retreated without endangering his life. It was an inquiry for the jury to determine on all the proof

whether the defendant could have retreated without en-
dangering his safety, or increasing his peril, and not a
matter to be decided by the court."

Charge No. 2 exacts too high a measure of proof in or-
der to a conviction, and was properly refused. A charge
in identical words was condemned by us in the case of
*Baldwin v. State,* 111 Ala. 12.

There was and could have been no dispute about the
defendant's right to carry a shot gun, the trial involving
only his right to use it against the deceased; and, there-
fore, the court could not be required to charge, as re-
quested by charge 3, upon a matter foreign to the issue.

As supporting the case for the State upon the ques-
tion of evidence here under consideration, the case of
*Rogers v. The State,* 117 Ala. 9, has been cited, but it is
wanting in analogy. There the proof showed that Rog-
ers being armed sought Hale who was unarmed, began
the dispute with him and shot him. The evidence he
sought to introduce was that Hale had eloped with his
daughter, promising to marry her, and had returned
from the trip without fulfilling the promise. This
showed    not    an    infatuation    for    the    daughter
interfered   with   by   Rogers,   but   rather   an   aban-
donment   of   the   daughter   and   a desire   to   get
away  from  her;  and  furnishing  no  motive  for
hostility on the part of Hale as against Rogers, it had
no tendency to show that Hale was the aggressor. More-
over, the proof concerning hostile demonstrations on the
part of Hale was insufficient to raise the question of self-
defense. Rogers testified that Hale threw his hand to
his hip pocket, but there was no proof that the pocket
contained or had contained a weapon, or that Hale was
making any present threat or doing any act to make the
hip pocket movement significant of danger to Rogers if
Rogers was not then himself aggressing upon Hale, and
if he was so aggressing he could not invoke the principle
of self-defense. Under the circumstances in proof in
that case the evidence there offered was properly ex-
cluded under the general rule declared in *Robinson v.
The State,* 108 Ala. 14, which was referred to in the
opinion.

[Gafford v. The State.]

The other rulings of the circuit court appear to be without error; but for those pointed out herein, it results that the judgment of the court below must be reversed and the cause remanded for further proceedings in conformity with this opinion. ·

Reversed and remanded.

NOTE: The foregoing opinion, down to what is said of charge 2, inclusive, was prepared by Hon. ROBERT C. BRICKELL, late Chief Justice, before his retirement, and is adopted by a majority of the present court.

TYSON J., dissenting.—The writer of this opinion presided at the trial of the defendant, in the court below, and for this reason, he would have preferred not to participate in a discussion of this case in this court. The law, however, does not disqualify him from sitting, but on the contrary imposes upon him the duty and responsibility of declaring the law as he believes it to be. The importance of the question involved, and the conviction that there was no error committed on the trial warrants him in expressing his views.

The sole proposition upon which a majority of the court rest the decision for a reversal, was the refusal to allow defendant to offer testimony tending to establish that illicit sexual relations existed between the deceased and defendant's sister, Mrs. Miller, for some months prior to the killing.

In my opinion, some of the conclusions reached by the writer of the main opinion can be shown to be erroneous, by a review of the testimony, as disclosed by the record, and by keeping in view the *order* of its introduction in the trial court bearing upon this question.

I do not deem it necessary to state the evidence introduced in behalf of the State, tending to establish the culpability of the defendant, nor all the evidence offered by him to prove his innocence, but will confine my statement of it, strictly to such portions as tend to shed light upon the question under consideration. Before doing so, however, I desire to state what the record does not contain. It nowhere appears that the defendant's sister

was a widow as stated in the main opinion; all the witnesses who speak of her, designate her as Mrs. Miller. This would authorize the presumption, and indeed we must presume, that she was a married woman, living at the time with her husband. Again the evidence is entirely wanting to show as to where she resided—presumably, in the absence of proof to the contrary, with her husband; and it is not shown that defendant resided with them in the same house: on the contrary it is disclosed affirmatively, that the defendant at the time and prior to the killing was living at the home of his kinsman, W. S. Hartley, assisting him in caring for and nursing his sick wife. It appears that the only threat ever communicated to defendant, was the one made to W. S. Hartley, the first witness examined by the defendant. He testified to a conversation with the deceased on the day of the killing in which deceased said to him, "Tell John Gafford, if he is at your house, that he (deceased) was going to kill him, that the country was not big enough for them both." To this statement witness asked, "what's the trouble," to which deceased replied, he knows "what's the trouble, you tell him what I say." It nowhere appears in this conversation that any allusion was made to Mrs. Miller, or the alleged relations that existed between her and deceased ,and the defendant, in his testimony in narrating what this witness told him, as to this threat, does not intimate that he had been informed by Hartley that deceased made any reference to his sister. In fact, he says that Hartley simply told him that deceased said "that this country was not large enough for us both." For aught that appears from the above, this threat had reference to some other matter of controversy between deceased and defendant. The testimony offered by defendant to establish acts of adultery, and excluded by the court, is not shown to have been communicated by the witnesses to him before the killing. Indeed, the only facts disclosed by the evidence, introduced by defendant tending to show there was any controversy between deceased and defendant over Mrs. Miller, appears in defendant's testimony as occurring just before the killing, which is in the following language: "Lloyd said he had

[Gafford v. The State.]

heard some talk in Greenville, and defendant said he was surprised that Lloyd had broken his agreement. Lloyd asked how? By lending her your buggy, said defendant. Lloyd said he was not at home when she got the buggy, that his wife lent it to her. Well, said defendant, that is all right if you did not let her have it." In offering the testimony of specific acts of adultery, there was no intimation by counsel, and it was not stated to the court, so far as appears in the record, that either of the witnesses who were called to testify to seeing specific acts of adultery between deceased and Mrs. Miller had ever informed defendant of what they had seen. It is upon the refusal of the court to permit this evidence to be introduced, that defendant's counsel in their brief complain. Before entering upon a discussion of the question raised by this ruling of the court, I desire to dispose of the question propounded by defendant's counsel to him relating to this subject. And in order to do so intelligently, the fact must not be overloked, that there was no evidence before the court tending to establish any illicit intercourse between deceased and Mrs. Miller when the question was asked; and we must not be unmindful of the rule so often announced by this court, that error will not be presumed, but must affirmatively appear from the record.—*Wilson v. State,* 113 Ala. 104; *Hurd v. State,* 116 Ala. 440. The question propounded was: "Were you aware of any illicit intercourse between Lloyd and your sister? the solicitor objected and the court sustained the objection of the solicitor, and the defendant duly and legally excepted to the ruling of the court." I have quoted the exact language of the question asked and the objection and rulings of the court. It will be observed that only a general objection was made by the solicitor and if there existed any legal objection to the question, this court will be constrained to hold, that the ruling of the court in refusing to allow the question to be answered was without error.—*Cobb v. State,* 115 Ala. 18; *Wilson v. State, supra; Hurd v. State, supra.* The question was undoubtedly leading and assumed as a fact that illicit intercourse between deceased and Mrs. Miller existed, when no such proof had been allowed to

be introduced and none had been offered tending to establish such a relation of which defendant had been informed by the witneses called to testify to it.—*Green v. State,* 96 Ala. 29. "In order to reserve an available objection to the exclusion of evidence a proper question must be asked."—8 Ency. Pl. & Pr. 236 and note 4. Besides, an offer must have been made showing what evidence would be given if the witness was permitted to answer the question and the purpose and object of the testimony sought to be introduced.—8 Ency. Pl. & Pr., *supra.*

In the case of *Tolbert v. The State,* 87 Ala. 27, Judge STONE, in speaking on this subject, said : "Several objections were made and sustained to questions propounded to witnesses; but it is not shown what answers the witnesses were expected to give, nor indeed, that they could have given any information on the subjects inquired about, affecting the defendant. We cannot consider these objections."

There was other testimony introduced by defendant, after he was examined as a witness, but it contained no reference to threats or the alleged relations between deceased and Mrs. Miller. It, however, does appear that on rebuttal the State introduced as a witness, the father of the deceased, who testified to two distinct interviews between defendant and deceased—one had at Hartley's house one week before the killing, and the other at the home of the deceased on Saturday night before the killing. In the first conversation the subject of discussion was whether there was any truth in the threats that each had been reported as making against the other, and a charge by defendant that deceased had been lending his buggy to Mrs. Miller, which was denied by deceased. In the second conversation defendant asked deceased "If there was any foundation in the rumor about you and my sister?" to which deceased replied : "There is no truth in the rumor, I have always had the greatest respect for her." That defendant and deceased parted at the end of each of the interviews very friendly.

I have alluded to this testimony for the purpose solely of showing that it cannot, in my opinion, affect the ques-

tion under consideration, should it be construed, as it
seems to be by the learned judge in his discussion of this
question, that it showed that improper relations existed
between deceased and Mrs. Miller, and as a result that
an injustice was done defendant by reason of the rulings
of the court in this respect, in that "the jury would natu-
rally look in vain for any motive that might have im-
pelled the defendant to become the aggressor" after a
friendly separation between them.  Upon whom should
the blame rest?  Trial courts are not clothed with the
power or authority to direct the manner in which parties
litigant try their causes.  Neither can they compel the
*order* in point of time in which testimony shall be of-
fered; nor are they presumed to know what state of facts
will be proven by any witness.  To so hold, as is clearly
held in the opinion of my brothers, is to say that the trial
judge must possess a mind capable of penetrating the
future and foretelling future events.  In other words, he
must be capable of anticipating the character and nature
of the testimony of every witness to be examined, when
called upon to decide the admissibility of evidence,
which in his opinion at the time is improper.

I feel confident that what I have said demonstrates
that there was no error in the refusal of the court to al-
low the question to be propounded to defendant, and re-
duces the points of difference between myself and the
majority of the court to a single inquiry.  It is, whether
the specific acts of adultery between deceased and Mrs.
Miller, uncommunicated to defendant, were admissible
in evidence for any purpose?  Leaving out of considera-
tion for the present the elements of self-defense, and ac-
cording to the defendant the same protection which the
law accords to a husband who kills the adulterer of his
wife, which, however, under the circumstances of this
case, I shall show later on that he is not entitled to, let
us inquire what were the husband's rights in such cases?
The rule stated in Bishop's New Criminal Law, vol. 2,
section 708, as follows:  "If a husband finds his wife
committing adultery and *under the provocation* in-
stantly takes her life or the adulterer's, the homicide is
only manslaughter.  But if, on merely hearing of the

outrage he pursues and kills the offender, he commits murder," seems to be, with one single exception, the universal rule of the courts of England and this country. In England this rule was so decided in the following cases and authorities: *Regina v. Mawgridge*, J. Kelyng, 137; Foster, 298; *Regina v. Kelly*, 2 C. & W. 814; *Manning's case*, Raymond's Rep. 212; *Fisher's case*, 8 C. & W. 182; *Moddy's case*, 1 Ventris Rep. 158. In America the following cases declare the same rule: *Hill v. State*, (62 Ga.) 1 Criminal Law Magazine & Reporter, 355; *Shufflin v. People*, 62 N. Y. 229; *People v. Osmond*, 138 N. Y. 80; *Sanches v. People*, 22 N. Y. 147; *State v. Bulling*, 105 Mo. 204; *State v. Holme*, 54 Mo. 153; *State v. France*, 76 Mo. 681; 1 Houston's Delaware Reports Criminal Cases, 249; *People v. Hurtado*, 63 Cal. 288; *Reed v. State*, 62 Miss. 405; *Alfred v. State*, 37 Miss. 296; *Sawyer v. State*, 35 Ind. 80; *State v. Avery*, 64 N. C. 608; *State v. Harman*, 78 N. C. 515; *State v. Samuel*, 3 Jones Law (N. C.) 74; *State v. John*, 8 Iredell, 330.

In this State the rule seems to be that if the husband detects his wife in the act of adultery and immeditely slays her or her paramour, the law does not entirely justify or excuse him, but holds the provocation sufficient, as matter of law, to reduce the killing to manslaughter; and if he *detects* them, not in the act of adultery, but in a compromising position under suspicious circumstances and immediately kills one or both of them, it is a question for the jury, whether the provocation was sufficient to reduce the grade of the offense and whether he acted under the heat of sudden passion thereby excited, as in other cases of homicide under the heat of passion excited by great provocation.—*Hooks v. State*, 99 Ala. 166; *McNeill v. State*, 102 Ala. 125; *Dabney v. State*, 113 Ala. 38. It will be observed that these three cases do not contravene the doctrine as laid down by Bishop, but simply do not require that it shall be necessary that the husband shall detect or discover them in the very act of adultery.

I have examined all of the cases above cited and many of the text books carefully, and have been unable to find any departure from that provision of the rule declaring that if the husband on merely hearing of the outrage pur-

sues and kills the offender he commits murder, except the case of *Copeland v. The State*, Horrigan & Thompson's Cases of Self-Defense, 41, relied upon as authority in the main opinion, which I maintain stands alone in American and English jurisprudence, and of which I will later give a more extended notice. The reason underlying this rule in England is stated in the case of *Regina v. Mawgridge, supra,* decided by the Court of King's Bench during the reign of Charles the Second, to be because the adultery of the wife is an invasion of the property rights of the husband. The language used by the court is in these words: "For jealousy is the rage of man and adultery is the highest invasion of property."

Pretermitting an extended discussion of the relations and rights of husband and wife under the old common law, I will content myself by showing in a brief way, that this reason assigned by the courts of England was the only logical one upon which the doctrine could rest. He was her lord and master and her will was subservient to his in all matters. So great was the matrimonial subjection of the wife to the husband, that "for at least one thousand years," says Blackstone, in the Kingdom of Great Britain the command or coercion of the husband either express or implied, "will privilege the wife from punishment even for capital offenses." As civilization progressed, the marital rights of the wife, however, were enlarged and her responsibility for crime increased, but even to this day in England and this country, actual constraint imposed by the husband will relieve her from the guilt of any crime committed in his presence.—1 Bishop, § § 358 *et seq.* While the cases cited from the various courts of this country, do not expressly assign any reason for the recognition of this rule, yet it may be fairly inferred from them that this right is accorded the husband on account of the jealousy and frenzy produced in his mind, incapable of being restrained by him, upon seeing or detecting an act so grossly violative of his sacred conjugal rights.

The next question I will discuss, is, did the defendant occupy such relation to Mrs. Miller as that he can be accorded the protection afforded her husband, had he, the

[Gafford v. The State.]

defendant, detected or discovered her and deceased in an
act of adultery and slain him on the spot?  We have
heretofore shown that Mrs. Miller was a married woman
living presumably with her husband, and that defend-
ant was not an inmate of their household.  Therefore,
there could have been no relations between them, which
imposed upon him a legal right or natural duty to pro-
tect her chastity.  She had surrendered those that ex-
isted between herself and her father's and mother's
household when she made the allegiance by marriage
with her husband.  By this act of marriage she formed
new and different relations and obligations, which bound
her to fulfill only to the satisfaction and gratification of
her husband and their immediate household and trans-
ferred to them alone this legal right and natural duty to
protect her.  These reasons to my mind are conclusive
that the reason given by the courts which accorded to
the husband this right, has no application to this case.
It is a maxim of the law that "reason is the soul of the
law and when the reason of any particular law ceases, so
does the law itself."—Broom Legal Maxims, 159.  In
support of the correctness of my views, I quote the lan-
guage as found in 1 Wharton on Criminal Law, section
460, as follows: ."A man can not, indeed, thus avenge
the adultery of his paramour, for the connection is not
merely unauthorized by law, but in defiance of law.  But
where there is a *legal* right and *natural duty* to protect,
there an assault on the chastity of a ward (using this
term in its largest sense) will be sufficient provocation
to make hot blood thus caused an element which will re-
duce the grade to manslaughter. * * Supposing the in-
jury to female chastity to be avenged in hot blood by a
brother, a father, or other person *having a right to pro-
tect* the person injured, the offense is but manslaughter.
But a brother cannot, after his sister has been appre-
hended in adultery, set up the provocation as a defense
to an indictment against him for killing her paramour."

In the case of *Lynch v. Commonwealth*, the Supreme
Court of Pennsylvania held, where Lynch, the defend-
ant, who lived with his sister, a married woman whose
husband was away from home and had been for five

[Gafford v. The State.]

weeks, suspecting that she was in the act of adultery, listened at the door of her chamber and being confirmed in his suspicious, took his knife from his pocket, opened it and forced the door in; he found her rising from the bed, undressed and a man in bed; he stabbed the man three times with the knife; of one of the strokes the man died —that the provocation was not sufficient to reduce the killing to manslaughter—77 Pa. St. 205. The foregoing demonstrates to my mind conclusively, that deceased could not have regarded defendant as an obstacle to his illicit intercourse with Mrs. Miller, if it existed, and that the jury would not have had a right to infer, had the fact of such intercourse been proven, a motive on the part of deceased, as said by my brothers, "to remove a dangerous obstacle out of the way of his illicit enjoyment."

The opinion of my brothers, in treating of the doctrine of self-defense, proceeds upon the assumption that the fact of sexual intercourse between deceased and Mrs. Miller was known to defendant. This I have shown to be erroneous. The testimony most favorable to this contention was that of the father of the deceased, which I have shown was introduced by the State on rebuttal. It nowhere appears in defendant's testimony. So in dealing with the rulings of the court on this question in connection with the defense of self-defense, we are bound to do so upon the state of the proof before the court at the time of its rulings. The only theory, therefore, upon which the main opinion is defensible is, that this testimony stands upon the same footing with uncommunicated threats. In discussing the declarations of deceased other than threats, the Supreme Court of California, in the case of *The People v. McLoughton,* 5 Criminal Law Rep. 404, said: "We do not see that the deceased stood in any such relation towards the commonwealth as to render his declarations admissible as evidence. It cannot be properly said that in prosecution of offenses, *mala in se,* the commonwealth asserts a private right or maintains an individual interest in any such sense as may be affected or bound by hearsay statements of those who may have been the victims or objects of a

criminal act on their property or person. There is no such legal identity or privity between them and the commonwealth as to render their statements admissible in behalf of those who are charged with the commission of the crime." This rule would, of course, govern as to the admissibility of acts of deceased of like import.

The general rule is that the defendant charged with a crime is limited in the introduction of evidence to such acts and declarations as constitute a part of the *res gestae;* "in other words they must stand in immediate causal relation to the act and become a part either of the action immediately producing it, or of action which it immediately produces. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations become in this way evidence of the character of the act."—Wharton's Crim. Ev., (8th ed.), § 263, and note. The only exception to this rule, that I have been able to find is, that the acts or declarations of deceased indicating a hostile condition of his mind towards the defendant are admissible in cases of doubt as to who was the aggressor, and to explain the nature and character of the assault, if made by him. And this doctrine is treated by all the text writers upon the subject of evidence as an exception to the general rule, and the only one recognized by them. All of them treat of the law of self-defense and of threats, communicated and uncommunicated, and, if the law be as contended for by my brothers, it is, indeed, passing strange that not one of these writers upon the subject of criminal law, nor any of the learned judges in the numerous cases which have been decided involving the doctrine of threats, ever intimated that the *cause* from which the threats made by deceased emanated, was admissible. Mr. Rice, in his work on Criminal Evidence, limits the doctrine to threats, and, inferentially excludes even acts indicating a hostile mind.

Should I concede that the threats made by deceased emanated from a belief that the defendant was interfering with his relations with Mrs. Miller, I must confess, I cannot see how the evidence of the acts of adultery would add any potency to their intensity or give them a

deadlier hue of hostility. While this court has held in a number of cases that evidence of former difficulties between the defendant and the party slain by him, may be introduced by the State, for the purpose of showing malice or motive for doing the deed, yet the inquiry was limited strictly to the fact of the difficulty, refusing to inquire into its merits or the particulars, and this too upon cross-examination by the defendant for the purpose of showing that the deceased was at fault in the former difficulty. Many of these cases show that the party slain had made threats against the defendant. The reason given by the court was that "any evidence touching the merits would have multiplied the issues before the jury and would have served no other purpose than to distarct and divert their attention from the real issues they were to try."—*Commander v. State*, 60 Ala. 1; *Mc-Anally v. State*, 74 Ala. 9; *Gray v. State*, 63 Ala. 66; *Rutledge v. State*, 88 Ala. 85; *Hudson v. State*, 61 Ala. 333; *Lawrence v. State*, 84 Ala. 424; *Stitt v. State*, 91 Ala. 10; *Jones v. State*, 116 Ala. 468. It certainly will not be denied, that, if defendant had been permitted to introduce this evidence, the State would have had the right to contradict it, and to this end introduce testimony to disprove it. So the issue tried would practically have been the one of illicit sexual intercourse between deceased and Mrs. Miller, instead of the crime, as preferred by the indictment against the defendant.

The only case of this court cited by my brothers upon which they rely for the latitude which they allow for the admissibility of this evidence, is *Mattison v. The State*, 55 Ala. 224. I have no controversy with the doctrine announced in that case, but insist that a proper application of it, is an authority for my contention and in perfect harmony with the principles declared in *Commander v. The State* and other cases cited *supra*. This court there said: "In inquiries of fact, dependent on *circumstantial evidence* for their solution, no certain rule can be laid down, which will define, with unerring accuracy, what collateral facts and circumstances are *sufficiently proximate* to justify their admission in evidence. Human transactions are too varied to admit of such clear decla-

ration of the rule. Whatever tends to shed light on the main inquiry, and *does not withdraw attention from this main inquiry by obtruding upon the minds of the jury matters which are foreign or of questionable pertinency*, is, as a general rule, admissible evidence. On the other hand, *undue multiplication of the issues is to be steadily guarded against as tending to divert the minds of jurors from the main issues.*" In the main opinion, while a portion of these qualifying words are quoted, still it is apparent that no importance is attached to them. In fact they are entirely ignored, and the broad language, "whatever tends to shed light upon the main inquiry" is made the basis of authority to sustain their views.

And these principles would be applicable if the defendant had known of the acts of adultery. In the case of *Neville v. The State*, 6 Jones Law (N. C.) 423, the evidence introduced by defendant tended to show that deceased was advancing upon him with a drawn knife, after hot words had passed between them, when he shot and killed him. The defendant offered to prove that on the evening before the killing, the deceased came to his home and tried to ravish his wife; the court below refused to permit him to do so. Justice RUFFIN, in an able opinion, which is the leading authority in this country on this subject, speaking for the court, held that "if admitted and believed, it could not change the character of the offense and ought to have been rejected."

In the case of *The State v. Herrell*, 97 Mo. 105, the defendant killed the paramour of his mother, who was a widow, in a sudden rencontre, and there was testimony tending to show he acted in self-defense, and this was one of his pleas. He offered to prove that the deceased and his mother had been living in adultery. The court said: "All this testimony as to deceased having lived in adultery with defendant's mother, was wholly outside of the case and constituted no palliation or mitigation of defendant's guilt of the homicide, and should not have been admitted."

In the case of *State v. Wilson*, 38 Conn. 126, the defendant offered to prove that while a prisoner confined

[Gafford v. The State.]

in the State prison as a convict for a long time previous
to the killing and at the time of the killing, the deceased,
who was the warden of the prison, fed him on "putrid
and stinking meat," and that by reason thereof, he was
compelled to kill deceased in self-defense, which was re-
fused by the lower court.   The Supreme Court of Con-
necticut affirmed this ruling, saying: "If all the prisoner
claimed to be able to prove had been proven or admitted
to be true, the court would have been bound to instruct
the jury that it furnished no justification for the killing.
\* \* The suggestion of counsel that the evidence might
be admissible to mitigate the offense was without force;
for the undoubted effect of the evidence was to show that
the killing was intentional, deliberate, premeditated and
not occasioned by any sudden provocation."

In *Rogers v. State*, 23 So. Rep. 666 (117 Ala. 9)  the
evidence of the defendant showed that he was the father
of Emma Rogers, a girl about 13 years old; that the de-
ceased carried her to church on Sunday night before the
homicide and had never brought her back; that he, de-
fendant, who was away, returned to Gadsden Tuesday
evening and some of his children told him that deceased
was back and had a gun and had said if he, defendant,
asked him anything about Emma he was going to kill
him; that on the morning of the killing he saw deceased
at one Patterson's house, and that upon going up to the
crowd who were sitting on the front porch, he asked de-
ceased where his daughter was, to which he made no re-
ply; and he then asked him, why he had carried her off,
and that to this inquiry the deceased said he carried her
off because he wanted to, and then threw his hand to his
hip pocket, whereupon defendant shot him.   The defend-
ant then offered to prove by other witnesses that de-
ceased had carried his daughter from the church on Sun-
day night next before the killing to the house of a kins-
woman of his, and that during the night, between mid-
night and day, he induced the girl, under promise of
marriage, to go with him to Ashville, Ala., and stopped
at the house of a sister of deceased; that the two stayed
at the house for a day and night, when the deceased left,
Tuesday, and returned to Gadsden, Ala., leaving the girl

in Ashville, not having married her or even offered to
marry her; and that these facts were communicated to
defendant a short time before the homicide. The circuit
judge refused to permit the evidence to be introduced.
On appeal to this court, Justice McClellan, delivering
the opening, said: "The facts that the deceased, a boy
16 years of age, carried the daughter of defendant, a girl
of 13 or 14 years, from Gadsden to Ashville 3 or 4 days
before the homicide, under a promise of marriage; that
he did not marry her; and that leaving her at Ashville,
he returned to Gadsden two days before the shooting, can
neither justify nor palliate the defendant's act in killing
him, nor shed any legitimate light on the transactions.
And this would be true even had his wrong been more ag-
gravated,—*even had he debauched the girl,* of which
there is no pretense. In such case, if the mortal blow
had been given by the father immediately upon hearing
of the wrong to his daughter and in the heat of passion
engendered by the fact coming to his knowledge, all the
facts would have been admissible to *eliminate the ele-
ment* of malice from the act, by referring it to passion
which had not had time to cool, and thus reducing the
homicide to manslaughter. But there is no pretense that
the homicide was committed under these circumstances.
To the contrary, it affirmatively appears that the defend-
ant came to a knowledge of all the facts—as full knowl-
edge as he had at the time he shot deceased—two days
before the shooting occurred. This court is firmly com-
mitted to this view in consonance with long established
principles, and we take this occasion to *utterly* repudi-
ate what is said in the case of *Flanagan v. State,* 46 Ala.
703, to the contrary; and on the point under considera-
tion that case is overruled. The trial court did not err,
therefore, in its rulings on the proposed evidence. The
homicide involved here was either murder or *justified on
the ground of self-defense."* This case, however, was re-
versed upon the refusal of the lower court to give a
charge requested by defendant. On the second trial, the
record shows that the evidence introduced by defendant
tending to establish self-defense, was substantially the
same as upon the first. The defendant then offered to

6

prove that deceased did have sexual intercourse with his daughter on their trip to Ashville under promise of marriage. Upon a second appeal to this court (23 So. Rep. 1007) Justice McCLELLAN, speaking for the court, said: "On this appeal the court holds that the trial court in its rulings followed the ruling of this court on the former appeal and there is no error in the record.—*Rogers v. State,* 22 So. Rep. 666."

The main opinion undertakes to distinguish this case from the one under consideration and holds as a matter of law that the proof concerning hostile demonstration on the part of Hale, the deceased, was insufficient to raise the question of self-defense. With all due respect to the opinion of my brothers, I submit that their reasoning is fallacious and indefensible. The facts in the two cases are practically the same except that in the *Rogers Case,* the defendant was the father and the natural guardian of the chastity of his 13 year old girl, and the outrage upon her was known to him at the time of the killing; while in the case under consideration, as we have shown, the defendant was not the guardian of Mrs. Miller's chastity and did not know of any acts of adultery between her and deceased. It will be observed that in each there were threats made by deceased against the defendants; in the *Rogers Case* the threats of deceased were directly traceable to the act of adultery with defendant's daughter; whereas in this case, they were, at best, merely inferably traceable to the acts of adultery between deceased and Mrs. Miller.

If the specific acts of adultery offered to be proven between deceased and Mrs. Miller were unknown to defendant, as I contend they were, but he merely suspected the relation to exist, then the case of *Robinson v. State,* 108 Ala. 14, is directly in point. The evidence in this case for the defense, tended to show that when approached by defendant, the deceased was in a conversation with a sixteen year old sister of the former; that defendant asked the deceased his intentions. called his attention to the fact that he had told him to let his sister alone, and that after some quarreling. the deceased drew his pistol and fired twice upon the defendant, and that the latter

returned the fire, killing the deceased. During the progress of the trial, the defendant showed that a note from his sister was found on the body of the deceased, and offered to prove the contents of the note, stating that this would show that deceased had met the defendant's sister at the place of the killing by appointment and for the purpose of having illicit intercourse with her. The court refused to allow the note in evidence. Again Justice McClellan delivered the opinion of the court, in which he said: "Neither the contents nor the existence of the note received by the deceased from the defendant's sister and found on the person of the former after the homicide, nor the note from deceased to the sister to which this was a response was known to the defendant at the time of the killing. His conduct, therefore, could not possibly have been influenced in any degree by these notes; and *of course, they could not* be looked to, to furnish a *circumstance either of guilt or innocence, nor of aggravation or palliation in respect of the offense* for which he was tried and convicted. Had he known of this correpondence and its character, it and his knowledge of it would have been competent evidence of premeditation and malice on his part, unless he came by it, for the first time to a knowledge of the illicit relations between deceased and his sister and immediately in the heat of passion engendered by it and before cooling time as the law wisely defines that period, he had shot and killed deceased. *As he did not know of it at all,* the court properly excluded it from the jury."

This case is not only authority for the proposition for which I have cited it, but also for the doctrine laid down in the case of *Rogers v. State.* If *dictum,* upon this last point, it is in harmony with every decision of the American courts except the decision in the case of *Copeland v. State,* Horrigan & Thompson's Cases of Self-Defense, 41 heretofore referred to.

In the case of *People v. Osmond,* 138 N. Y. 87, Justice Peckham said: "Again, counsel for the defendant claims evidence should have been permitted, even though the defendant was ignorant of it, which tends to show that the (his) wife and Burchell were maintaining illicit

relations. \* \* \* The principle is not the same as that
decided in *People v. Stokes* (53 N. Y. 164). There the
question was in regard to the character of the encounter
which took place between the parties when the shooting
was done: was it done by Stokes in self-defense or was he
the aggressor? It was held competent to prove the fact
that the deceased had himself made violent threats
against Stokes shortly before, even though those threats
had not been communicated to defendant. This was upon
the ground that the jury might consider the fact in deter-
mining the character of the encounter between the par-
ties. But how can acts of infidelity or acts which tend
to prove infidelity on the part of the wife, in *any* degree
tend to show the state of the mind of the defendant upon
this subject if such evidence had not been known or re-
peated to him? We entertain no doubt of the correct-
ness of the ruling of the court below in this case."

On account of the length of this opinion, I must con-
tent myself by simply saying of the opinion in the case
of *Copeland v. The State*, upon which the decision of the
majority of the court in this case relies mainly for their
conclusion, that it does not go to the length of holding
that if the act of adultery had been unknown to defen-
dant, it would have been considered by the court. In
the main opinion it is said: "If the question of self-de-
fense were out of this case, it would be quite clear that
all testimony of this character would be inadmissible
for the purpose of justifying the murder and would be
equally unavailing to reduce the killing from murder to
manslaughter." The argument is, as self-defense is in
the case, the defendant may introduce the testimony for
the purpose of justification, which I have shown tends
alone to establish that the killing was intentional, delib-
erate and premeditated. If this is sound logic, he may
take the sword of justice and convert it into a shield to
protect himself from the legal consequences of a deliber-
ate murder.

In my opinion the judgment of the court should be af-
firmed.

HARALSON, J., concurs in the conclusion reached in the
foregoing dissenting opinion.